IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:13CR278 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | |
| | ) | |
| JEREMY A. MACK, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Now comes the United States of America, by and through its counsel, Steven M. Dettelbach, United States Attorney, and Assistant United States Attorneys Bridget M. Brennan and Carol M. Skutnik, and hereby submits this Sentencing Memorandum for the purpose of addressing:  (a) the four-level enhancement for "role in the offense" in accordance with U.S.S.G. § 3B1.1(a); and (b) the quantities of controlled substances distributed by Defendant.

**I.     Background**

On February 18, 2014, after a week-long jury trial, Defendant was convicted of all nine counts charged in the Superseding Indictment.  Pursuant to the Court's Order, the Probation Department prepared an initial Presentence Report ("PSR") and provided that report to government counsel and defense counsel.  Among many other things, the PSR contained a four-level enhancement in Defendant's Guideline calculation for his role in the offense as an organizer or leader of five or more participants.  On May 28, 2014, along with the publication of

the final PSR, the government learned for the first time that defense counsel made several objections to the initial PSR, including that it contained the four-level enhancement for the role in the offense, and that defense counsel did not agree with the quantities of cocaine and heroin reflected in the Guideline calculation.

**II.     Law and Argument**

    **A.     Defendant Was the Organizer and Leader of His Sex Trafficking and Drug Trafficking Enterprise**

Pursuant to U.S.S.G. § 3B1.1(a), a defendant's Guideline calculation may be increased "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." Thus, before imposing a four-level adjustment pursuant to Section 3B1.1(a), the Court must find that: (1) Defendant was a leader and organizer of criminal activity, and (2) the criminal activity involved five or more participants. U.S.S.G. § 3B1.1(a).

A leader or organizer can be identified by considering the following:

(1)     the exercise of decision making authority;

(2)     the nature of participation in the commission of the offense;

(3)     the recruitment of accomplices;

(4)     the claimed right to a larger share of the fruits of the crime;

(5)     the degree of participation in planning or organizing the offense;

(6)     the nature and scope of illegal activity; and

(7)     the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, Application Note 4.

The Court is well aware of Defendant's role in this criminal enterprise. Defendant's decision making authority and participation were detailed throughout his week-long trial,

including that Defendant alone made the following decisions:  the price of drugs sold; to whom they would be sold and when; the rates the victims were instructed to charge for appointments; where the appointments would occur; how they would get to and from the appointments; the procedure for obtaining money from customers and texting Defendant about the beginning and end of each encounter (so that he could keep track of money owed to him); whether and when some of the victims were permitted to leave the house on Tattersal Court; how the victims were supposed to look when going on appointments; and the procedure for texting him their drug debts so that he could reconcile their ever-increasing debts at the end of each day. (Trial testimony of Victims #1, #2 and #3; Trial testimony of Ashley Onysko; and Gov't Exs. 61 and 62 (text messages from Defendant's phone and the "Backpage phone", respectively)).

Additionally, Defendant recruited the accomplices and victims.  Defendant alone decided the role each person would play, and, in doing so, maintained complete control over his accomplices and victims.  Both the accomplices and victims consistently and repeatedly apologized to him for minor infractions and pleaded for his forgiveness.  By way of example, S. Crabtree acknowledged repeatedly apologizing to Defendant because she had talked to Victim #2 about tattoos without having first obtained Defendant's permission to do so.

Moreover, text messages from Victim #4 demonstrated her attempts to avoid angering Defendant:

March 4, 2013:
- "I'm sorry jay.. please don't be made at me.  I'm just scrambling to take care of everything..i want you to be in a good mood.  (Gov't Ex. 61, line 76).

March 6, 2013:
- "Hey babe, just wanted to let you know shaun is on his way.  He'll be here around 4.  In the meantime..i'm rly tryin for one until then.  Because I'm guna have a rly hard time doing this 2 hours with nothing :/  I'll let you know what's up.  (Gov't Ex. 61, lines 223 and 224).

- Defendant's response: "See if shit was on point you'Dr of been straight going into that 2 hour app. (Gov't Ex. 61, line 228).

- I've been tryin to be on point..and be as appealing as I can. (Gov't Ex. 61, line 231).

March 12, 2013:
- I love you. I'm so scared. I fucked up twice in a row..they told me they were here..they weren't..I know I know. I love you tho. Sorry :/ (Gov't Ex. 61, line 509).

Additionally, Defendant claimed a right to *all* of the proceeds earned by accomplices and victims, not just a "larger share of the fruits of the crime." And when it came to control, Defendant used threats, such as "I'm not afraid to kill a bitch." (Trial testimony of Victims #1 and #2). Defendant also used force to demonstrate his physical control and to create a climate of fear. Indeed, Defendant choked out Victim #4 on two occasions, and attacked Onysko's boyfriend because the boyfriend spoke directly to Victim #1 without first getting Defendant's permission to do so. Defendant conducted cavity searches when he believed that others had stolen from him. (Trial testimony of Victim #1; Gov't Ex. 72-4-A (May 10, 2013 jail recording) (Defendant: "I'm gonna say this over the phone alright – there was one time where I searched the mother fuckers, you know, because some, because some money come up missing.").

Defendant engaged more than five participants to assist him in his criminal enterprise. A "'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, Application Note1; *see also United States v. Anthony*, 280 F.3d 694, 698 (6th Cir. 2002) ("participants" are persons "who were (i) aware of the criminal objective and (ii) knowingly offered their assistance").

During the trial of this matter, the Court heard testimony from (or about) numerous people who knowingly assisted Defendant with his sex trafficking and drug trafficking enterprise. Nonetheless, the government will discuss six of those participants:

(1) <u>Ashley Onysko</u>. Onysko is a co-defendant in this case. She pleaded guilty to conspiring with the Defendant to engage in sex trafficking and drug trafficking. At Defendant's direction, Onysko was responsible for: answering the "Backpage phone;" maintaining the records of Defendant's drug deals and the victims' appointments for commercial sex acts; driving the victims back-and-forth to the motel; collecting the monies each victim earned from appointments; and providing all monies earned to the Defendant at the end of each day.

(2) <u>Toby Lewis</u>. Lewis is Defendant's eldest son. Lewis was only 17-years old in December 2012, when Defendant began discussing drug and firearms trafficking. (Trial testimony of Aubrey Dillinger, Lewis's ex-girlfriend). In Defendant's absence, Lewis would help transport victims to the motels for appointments. (Trial testimony of Ashley Onysko). Lewis would also distribute drugs at Defendant's direction. (*Id.*; Gov't Ex. 61, line 235, 3/6/13 (in response to a plea from Victim #4 for a shot of heroin before an appointment, Defendant sent the following text message: "Show this text to Toby. Give her one of those real quick.")).

(3) <u>Carly Hribar</u>. Hribar purchased drugs from Defendant. At Defendant's direction, Hribar drove Victim #2, a minor, to a motel for purpose of engaging in a commercial sex act. (Trial testimony of Victim #2). Hribar also waited outside the motel during the appointment, and drove Victim #2 back to Tattersal Court after the appointment ended). *Id.*

(4) <u>Sarah Crabtree</u>. Crabtree also purchased drugs from Defendant. At Defendant's direction, Crabtree assisted with transporting victims to the motel for appointments. At trial, Crabtree testified that she warned Defendant when she thought someone with whom he was dealing might "snitch" on him. Crabtree also facilitated Defendant's efforts to find affordable motel rentals. (Gov't Ex. 25-40 (photograph of handwritten notations of backpage.com user names and passwords, and motel information with hourly rates, which were signed by Crabtree and dated "2013").

(5) <u>Monica Freeman</u>. Freeman also purchased drugs from Defendant. At Defendant's direction, Freeman transported victims to the motel for appointments. Freeman also testified that on one occasion she drove Victim #4 back to Tattersal Court while Victim #4 cried about how scared she was to be taken back to Defendant.

(6) <u>Katie Frioud</u>. Frioud also purchased drugs from Defendant. At Defendant's direction, Frioud provided Defendant with a pre-funded debit card so that Defendant could place advertisements on backpage.com. (Trial testimony of Katie Frioud; Gov't Ex. 31-1 to 31-5 (Backpage.com advertisement for Victim #4, dated 12/27/2012)).

In conclusion, it was proven at trial that Defendant organized and led more than five knowing participants in his sex trafficking and drug dealing enterprise. Accordingly, a four-level enhancement for his aggravating role should be included in Defendant's final Guidelines calculation.

### B.     Defendant Distributed More than 100 Grams of Heroin

Defendant's Guidelines calculation includes a calculation for his distribution of heroin and cocaine. Specifically, in paragraph 83 of the PSR, the Probation Department determined a base offense level of 26 for the drug distribution counts pursuant to "2D1.1(c)(7)". In the narrative portion of that paragraph, however, the Probation Department included the language set forth in Section 2D1.1(c)(8). In any event, the government has reviewed the Defendant's text messages and, as a result of that review, has calculated that, between March 3, 2013 through April 9, 2013, Defendant distributed *at least* 105.41 grams of heroin as follows:

- Victim #1: Defendant distributed 31.86 grams of heroin, totaling $6,372.

- Victim #3: Defendant distributed 14.15 grams of heroin, totaling $2,830.

- Victim #4: Defendant distributed 55.635 grams of heroin, totaling $11,127.

- Monica Freeman: Defendant distributed 7.375 grams of heroin, totaling $1,475.

The government calculated these amounts by reviewing the debt increases line-by-line for each of these people. (See Gov't Ex. 61).[1] Notably, the government only needed to calculate distribution amounts for four people in a one-month period of time in order to reach the "more than 100 grams of heroin" threshold. Thus, this is a very conservative calculation. It does not

---

[1] As the Court may recall, defense witness Cory Tino was asked on cross-examination how much a "point" (i.e., .1 grams) of heroin cost when it was sold by the Defendant. Mr. Tino testified that a "point" of heroin from the Defendant cost $20. Accordingly, the government was able to calculate the total amount of heroin distributed as set forth above by adding up the dollar amounts in the "debt-increase" text messages and dividing that total number by $200.

include other individuals that self-identified as purchasing heroin from Defendant (i.e., all of the witnesses he called at trial). This calculation also does not include the full time period charged in the Superseding Indictment. Indeed, Onysko testified that Defendant was selling heroin as early as November 2012 – within days of his release from the Bureau of Prisons.[2] Accordingly, because a very conservative calculation demonstrates that Defendant distributed at least 105.41 grams of heroin, finding a base offense level of 26 (for distributing more than 100 grams of heroin) is appropriate.

### III. Conclusion

For the reasons set forth above, the government respectfully requests that the Court adopt the Probation Department's recommendation that Defendant receive a four-level enhancement for his aggravating role, and that the base offense level for his distribution convictions be a 26.

Respectfully submitted,

STEVEN M. DETTELBACH
United States Attorney

By: /s/ Bridget M. Brennan
Bridget M. Brennan Reg. No. 0072603
Assistant U.S. Attorney
400 United States Courthouse
801 West Superior Avenue
Cleveland, Ohio 44113
Phone: 216-622-3810
Fax: 216-522-7358
Email: bridget.brennan@usdoj.gov

---

[2] With respect to Defendant's distribution of cocaine, Fred Alston testified that he provided Defendant with 194 grams of cocaine, which Onysko testified was sold and provided by Defendant to others, including herself.

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of June, 2014, a copy of the foregoing Government's Sentencing Memorandum was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Bridget M. Brennan
Bridget M. Brennan
Assistant U.S. Attorney