1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
2                          EASTERN DIVISION

3     UNITED STATES OF AMERICA,        Case Nos. 1:13cr278
                                                 1:05cr327
4                                      Akron, Ohio
                  Plaintiff,           Thursday, June 12, 2014
5
          vs.
6
      JEREMY MACK,
7
                  Defendant.
8

9                      TRANSCRIPT OF PROCEEDINGS
                      BEFORE THE HONORABLE SARA LIOI
10                   UNITED STATES DISTRICT JUDGE

11

12
                          SENTENCING HEARING
13

14
      APPEARANCES:
15
      For the Government:       Bridget M. Brennan
16                              Carol M. Skutnik
                                Assistant United States Attorneys
17                              Northern District of Ohio
                                Suite 400
18                              801 Superior Avenue, West
                                Cleveland, Ohio  44113
19                              216/622-3810

20
      For the Defendant:        Lawrence J. Whitney, Esq.
21                              Nathan A. Ray, Esq.
                                Burdon & Merlitti
22                              Suite 201
                                137 South Main Street
23                              Akron, Ohio  44308
                                (330) 253-7171
24

25

                Lori A. Callahan, RMR-CRR        (330) 252-6022

1

2

3    Court Reporter:              Lori Ann Callahan, RMR-CRR
                                 United States District Courthouse
4                                Room 568
                                 2 South Main Street
5                                Akron, Ohio  44308
                                 (330) 819-8676
6

7

8

9

10   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<div align="center">P R O C E E D I N G S</div>

<div align="center">- - -</div>

THE COURT:  Please be seated.

Please call the cases.

COURTROOM DEPUTY CLERK:  The cases before court is Case Number 1:13cr278-01, United States of America versus Jeremy Mack, and 1:05cr327-19, United States of America versus Jeremy Mack.

THE COURT:  I will ask lead counsel for each party to please identify yourself and your cocounsel and also indicate if you have a client or client representative present and we will begin with lead attorney for the government.

MS. BRENNAN:  Thank you, Your Honor.  Bridget Brennan on behalf of the United States.  Seated with me is Assistant United States Attorney Carol Skutnik.  And also seated with us are FBI Special Agents Kelly Liberti and Kirk Spielmaker.

THE COURT:  Good morning.

MS. SKUTNIK:  Good morning, Your Honor.

THE COURT:  Mr. Whitney.

MR. WHITNEY:  Thank you, Judge.  I am Lawrence J. Whitney.  Here with me is Nathan Ray, my cocounsel, along with Jeremy Mack.

THE COURT:  Good morning to you, as well.

1          Also with us today are United States Supervising

2     Probation Officer Brian Laffin and United States Probation

3     Officer Henry Serna.

4          PROBATION OFFICER:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          So we're really here on two separate matters.  One

7     dealing with violations, supervised release violations that

8     were lodged against Mr. Mack, some of which in the end

9     resulted in the charges in the 2013 case for which we're

10    here for sentencing.

11         So what I intend to do is to first address the

12    violation reports, and then depending upon how that hearing

13    proceeds, then to address sentencing in both matters at the

14    same time.

15         So, first of all, there were a number of violation

16    reports filed relative to Mr. Mack's 2005 case.

17    Violation -- and I will just list them by their dates.

18    February 6, 2013, February 22, 2013, March 29, 2013, April

19    9, 2013, April 10, 2013, June 19, 2013, May 22, 2014.

20         So, first of all, Counsel, do you have copies of

21    each of these violation reports and supplemental reports?

22         MS. BRENNAN:  We do, Your Honor.  Thank you.

23         MR. WHITNEY:  We do, Judge, and the court was kind

24    enough this morning to permit us to speak with the defendant

25    about it prior to this, our first time we came into the

Lori A. Callahan, RMR-CRR        (330) 252-6022

| | |
|---|---|
| 1 | courtroom, and we did, in fact, go over each report with |
| 2 | him. |
| 3 | THE COURT:  Excellent. |
| 4 | So basically the violation report -- the initial |
| 11:23:46  5 | one set forth three violations, and then as things unfolded |
| 6 | and the -- there ended up being six violations, Mr. Serna? |
| 7 | PROBATION OFFICER:  Correct. |
| 8 | THE COURT:  So first of all, Mr. Mack, have you |
| 9 | had an opportunity as your attorney just indicated to review |
| 11:24:08  10 | the violation reports and supplemental reports? |
| 11 | THE DEFENDANT:  Yes, Your Honor. |
| 12 | THE COURT:  Do you understand the nature of all of |
| 13 | the violations alleged in the reports?  It started with |
| 14 | three and then eventually because of the way the charges |
| 11:24:22  15 | came down, in your new case, it ended up into being six |
| 16 | violations. |
| 17 | Do you understand that? |
| 18 | THE DEFENDANT:  Yes. |
| 19 | THE COURT:  And I guess I will ask, just for |
| 11:24:32  20 | purposes of making a proper record, if government's counsel |
| 21 | will set forth the six violations alleged in the violation |
| 22 | report. |
| 23 | MS. BRENNAN:  Certainly, Your Honor.  Would you |
| 24 | like me to read them, or just do a brief summary of each |
| 11:24:52  25 | or -- |

Lori A. Callahan, RMR-CRR        (330) 252-6022

1          THE COURT:  Either way is fine.  I suppose --

2     because they are related -- in fact, at the end of the day,

3     most of them are related to the new charges, that resulted

4     in the charge in 2013 case, either way will be fine.

11:25:06  5          MS. BRENNAN:  Okay.  Your Honor, the first one

6     would be a law violation for Mr. Mack's possession of

7     heroin, aggravated trafficking in drugs and illegal use of

8     food stamps on February 3, 2013.  That is an arrest that we

9     know was addressed here during the trial of this matter.  He

11:25:25  10     was indicted in Lorain County for trafficking in drugs, an

11     F-4, possession of drugs, an F-4, possession of drugs, an

12     F-5, and drug paraphernalia, an M-4.  Ultimately that was

13     dismissed from the instant case.

14          Second violation is possession of a controlled

11:25:41  15     substance.  At the time of his arrest on February 3, 2013,

16     he was found to be in possession of 26 baggies containing .2

17     grams of heroin in each.  The fact that it was heroin and

18     the amounts of those drugs were set forth in Government's

19     Exhibit 61 during the trial of this case.

11:26:00  20          Violation 3, drug use.  February 4, 2013, the

21     defendant provided a urine specimen which tested positive

22     for the use of marijuana.  Results were certified on

23     February 13, 2013.

24          The fourth law violation is the arrest of the

11:26:16  25     Lorain County Drug Task Force drug trafficking in heroin

1    stemming from the April 9, 2013 arrest that was also the

2    subject of much testimony during the course of this trial.

3              Number 5 is a law violation.  April 9, 2013,

4    arrested by the Lorain County Drug Task Force for compelling

11:26:38  5    prostitution and promoting prostitution, again, related to

6    the instant case.

7              Let's see, the last law violation.  May 29, 2013,

8    the federal indictment that is the subject of this case,

9    Your Honor.

11:26:57  10             THE COURT:  Thank you.

11             So, Mr. Mack, did you understand each of the

12    alleged violations as set forth in the violation reports and

13    supplemental reports?

14             THE DEFENDANT:  I do.

11:27:34  15             THE COURT:  Now, Mr. Mack, you are entitled to a

16    hearing to determine if you violated the terms and

17    conditions of your supervised release.  The government is

18    required to prove the violations by a preponderance of the

19    evidence.  At the hearing you are entitled to present

11:27:51  20    evidence and question any adverse witness unless the court

21    determines that the interest of justice does not require the

22    witness to appear.

23             You have the right to retain counsel or to request

24    that counsel be appointed if you cannot obtain counsel.  You

11:28:05  25    will have an opportunity at the hearing to make a statement

1    and present any information in mitigation.

2           If the court finds that you violated the terms of

3    your supervised release, the court has the following

4    sentencing options, and they have been set forth -- the

11:28:23  5    sentencing options have been set forth in the reports and,

6    Counsel, I trust that you have each had an opportunity to

7    review the sentencing options as they relate to the

8    supervised release violations?

9           MR. WHITNEY:  We have, Your Honor.

11:28:37  10           MS. BRENNAN:  We have, Your Honor.

11           THE COURT:  All right.  But just to summarize for

12    Mr. Mack, as far as the advisory sentencing guideline

13    calculations as they relate to the supervised release

14    violations, under the policy statements in Chapter 7 of the

11:28:53  15    guidelines, the revocation range of imprisonment is 33 to 41

16    months, and that's based upon the most serious violation,

17    being a grade A violation, and you having a criminal history

18    category of VI.

19           However, there is a statutory maximum term of

11:29:09  20    imprisonment for the offenses of two years.  And so the

21    guideline sentence becomes 24 months instead of the previous

22    range I have had indicated.

23           Under the statute, if you -- found to have

24    violated a condition of supervised release, the court may

11:29:41  25    extend the term of supervised release or may modify, reduce

1    or enlarge the conditions or the court may revoke the

2    conditions and impose a term of imprisonment.

3         If the court finds that you have violated a

4    condition of supervised release and decides to impose a term

11:30:04  5    of imprisonment, it may impose a sentence of imprisonment up

6    to the statutory maximum, which I just stated was two years

7    or 24 months, and then the court may reimpose a term of

8    supervised release of up to three years, less any term of

9    imprisonment imposed upon revocation.

11:30:26  10        Revocation of supervised release and a sentence of

11   imprisonment is mandatory if you were found in possession of

12   a controlled substance.  There is an exception to that,

13   however, as detailed in the violation reports.

14        So have you fully discussed the sentencing options

11:31:04  15   with your attorneys relative to the supervised release

16   violation?

17             THE DEFENDANT:  I have, Your Honor.

18             THE COURT:  Have you yourself read all the

19   sentencing options as set forth in the violation reports?

11:31:12  20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  Okay.  Any sentence that the court

22   imposes for the violations may be ordered to be run

23   concurrent, partially concurrent or consecutive to any

24   sentence that you might receive in the new case.

11:31:25  25             Do you understand that?

Lori A. Callahan, RMR-CRR      (330) 252-6022

THE DEFENDANT: I do.

THE COURT: Counsel, any objections to the analysis of sentencing options as provided and referenced by the court as they pertain to the supervised release violations?

MS. BRENNAN: Not on behalf of the government, Your Honor.

MR. WHITNEY: None, Your Honor. Thank you.

THE COURT: All right. Now, Mr. Mack, and I will ask your attorney, do you intend to proceed with a hearing relative to the supervised release violations, or do you intend to waive your right to the hearing and admit to the violations?

MR. WHITNEY: Judge, we have gone over, as I said, all of the violations with the defendant, as well as the supplemental information reports. He does take issue, I think, with some of the facts as set forth in the supplemental information reports, but I don't think they're -- they're not prohibitive in terms of -- I think he admits to this court that the law violations that have been outlined by this court are, in fact, violations of his status and he does not want a hearing on the matter and we request that the court proceed with disposition.

THE COURT: All right. Mr. Mack, based on what your attorney has indicated to the court, is that your --

```
 1    not seeking to have a hearing on the supervised release

 2    violations, rather, you are waiving your right to the

 3    hearing, and even though you might quibble with some of the

 4    descriptions contained in the descriptions of the

 5    violations, you are agreeing or you wish to admit to the

 6    violations and have the court proceed with sentencing.

 7              Is that correct?

 8              THE DEFENDANT:  That's correct, Your Honor.

 9              THE COURT:  Anyone force you or coerce you into

10    giving up your right to the hearing?

11              THE DEFENDANT:  Not at all.

12              THE COURT:  Are you giving up your right to the

13    hearing after you had full opportunity to discuss your right

14    to a hearing with your attorneys?

15              THE DEFENDANT:  Yes, Your Honor.

16              THE COURT:  Are you giving up this right to a

17    hearing knowingly and voluntarily, sir?

18              THE DEFENDANT:  I am.

19              THE COURT:  I'm sorry?

20              THE DEFENDANT:  I am, Your Honor.

21              THE COURT:  All right.  And do you understand that

22    by giving up your right to the hearing and by admitting to

23    the violations, the court will find you guilty, or I'm

24    sorry, the court finds that you have committed the

25    violations, and that you've admitted to the violations and
```

11:32:53  5
11:33:06  10
11:33:17  15
11:33:26  20
11:33:39  25

1    the court will then proceed to impose a sentence?

2            THE DEFENDANT:  Yes, I understand.

3            THE COURT:  All right.  The court finds that

4    Mr. Mack has waived his right to the full evidentiary

11:33:54  5    hearing and that he has further admitted to the violations

6    of the terms of his supervised release and, therefore, the

7    court finds the violations as set forth in the updated

8    supplemental information report as to all six of the

9    violations.

11:34:14  10            We will proceed with sentencing -- on this matter,

11    that is, I'll make reference to it as the 2005 case, at the

12    same time as the court proceeds with sentencing in the 2013

13    case which we will now address.

14            All right.  With respect to the 2013 case, that

11:35:00  15    was, of course, 13cr278, Mr. Mack was charged in a

16    nine-count superseding indictment as follows:

17            Count 1, conspiracy to commit sex trafficking or

18    drug trafficking.  Counts 2, 3, 4 and 5, which were four

19    separate counts of sex trafficking.  Count 6, distribution

11:35:49  20    of a controlled substance, specifically heroin.  Count 7,

21    distribution of a controlled substance, specifically

22    cocaine.  Count 8, obstruction of justice through witness

23    tampering.  And Count 9, obstruction of justice.

24            On February 18, 2014, Mr. Mack was found guilty by

11:36:15  25    a jury of all nine counts contained in the superseding

Lori A. Callahan, RMR-CRR        (330) 252-6022

1   indictment.  I will indicate that with respect to Count 3,

2   which is the sex trafficking involving a minor, there were

3   two separate ways or two separate theories the government

4   put forth before the jury, two separate violations of the

11:36:46  5   statute.  One was by force, and one dealt with -- by force

6   or coercion and the other dealt with the other part of the

7   statute which was often referred to as a strict liability

8   because knowing the age of the child, or knowing the age of

9   the minor, so two separate portions of the statute.

11:37:18  10          MS. BRENNAN:  I don't believe it's necessarily

11   strict liability, Your Honor.  I think it's -- there's some

12   reasonable opportunity to view the limits.

13          THE COURT:  Exactly.  And I shouldn't have -- I

14   short-termed it, and I should not have.  I was trying to

11:37:30  15   differentiate between the two and the court does stand

16   corrected.

17          The way that we took a precaution when we actually

18   charged the jury and it wasn't presented to them in that --

19   in a strict liability fashion.  They had to make a finding.

11:37:45  20   We did that on purpose so that there would be no questions

21   and so as to avoid an error, any error on that issue, and so

22   it probably is more prudent to stay away from that term now,

23   suffice it to say that the charge was brought against

24   Mr. Mack as it involved a minor on two different bases and

11:38:16  25   the court found Mr. Mack guilty as to both, both as to the

14

1    force and coercion and as to knowing that Victim Number 2

2    was a minor.  That's a better way to say it.

3            So the case is set today for -- the case is set

4    today for sentencing.

11:38:43  5    The court has received and reviewed the final

6    presentence report, the government's sentencing memorandum,

7    the defendant's sentencing memorandum, and two of the

8    victims have also submitted victim impact statements.

9            Mr. Mack, have you received and reviewed copies of

11:39:12 10   all of those -- all of the documents that I've just

11   mentioned, sir?

12           THE DEFENDANT:  I've reviewed them with my

13   attorneys.

14           THE COURT:  Yes.  So you have had an opportunity

11:39:23 15   to review all those documents with your attorney before --

16           THE DEFENDANT:  Yes, I have.

17           THE COURT:  -- the sentencing?  Okay.

18           As set forth in the addendum to the report, the

19   court understands that the government has no unresolved

11:39:38 20   objections to the report and that the defendant does have a

21   number of unresolved objections to the report.

22           I will indicate that there was a prior, if you

23   will, final report submitted and there were some errors that

24   the -- that were discovered and so the report was revised on

11:40:11 25   June 5, and it's docketed at Docket Number 182 and that's

Lori A. Callahan, RMR-CRR        (330) 252-6022

1    the report the court will be working off of.  Some of what

2    were unresolved objections have now been resolved in this

3    later version of the report, but we will now consider any

4    outstanding objections that the defendant has to the report.

11:40:39  5    So let's first address the objections as I

6    understand them to exist.

7    MR. RAY:  Your Honor, may it please the court.

8    Nathan Ray on behalf of Mr. Mack.

9    Judge, what I would like to start the court with

11:40:57  10   as far as our objections is as it relates to the four-level

11   enhancement for Mr. Mack as being an organizer or leader of

12   criminal activity.

13   THE COURT:  Sure.  And we will get to that -- let

14   me just try to dispose of some of the other ones first

11:41:13  15   because I think that is one of your main objections.

16   MR. RAY:  It is.  Thank you.

17   THE COURT:  So let's try to sort of resolve some

18   other ones first.  Let's look at the objections as they are

19   listed on the report, and one of the objections that you

11:41:27  20   have is that the -- the 2005 case is not a related case as

21   is suggested on page 1 of the report, and the 2005 case is

22   simply a case involving Mr. Mack.  And I suppose that can be

23   changed instead of related case.  It's just another case

24   involving the defendant, which frankly we need to dispose of

11:42:05  25   relative to the violations.

Lori A. Callahan, RMR-CRR     (330) 252-6022

1          So you're right, it's not related in the sense

2     necessarily that it's a continuing -- a continuation of what

3     occurred in the 2005 case, if that's what you mean.

4          MR. RAY:  Correct.

11:42:19  5          THE COURT:  So I will just ask the probation

6     department to pick a different term to describe that,

7     perhaps pending case, something to that effect, other

8     pending case.

9          MR. RAY:  Correct.

11:42:42  10          THE COURT:  And that way it's clear it's not

11     related in the sense that someone could misunderstand the

12     term.

13          PROBATION OFFICER:  Your Honor, would it be -- if

14     provisions are going to be made, simple to remove that and

11:42:57  15     say there are none, because that case is listed in his

16     criminal history section.

17          THE COURT:  Sure.  I don't think -- and maybe

18     that's the easiest way to resolve it.  I don't think it's

19     necessary to put it on the cover sheet.  It is listed and we

11:43:11  20     are having a hearing on it today and there will be a

21     judgment entry relative to it.  So I suppose there's no harm

22     in deleting it from the face sheet other than it might be

23     helpful for someone who's looking at this to know that there

24     are and will be two judgment entries, and that could be a

11:43:35  25     flag.

Lori A. Callahan, RMR-CRR        (330) 252-6022

1        So I guess upon reflection, keep it on there as

2   another pending case involving the defendant, and that way,

3   it will at least trigger and flag for someone that he does

4   have two cases.

11:43:53 5        Is that satisfactory --

6        MR. RAY:  Correct.

7        THE COURT:  -- to everyone?  The government, as

8   well?

9        MS. SKUTNIK:  Yes, Your Honor.

11:44:01 10        THE COURT:  All right.  So that addresses the

11   first objection.

12        So I suppose if I have to come down with a ruling,

13   that objection is sustained and there will be a

14   modification.

11:44:17 15        Next, the second objection relates to the amount

16   of drugs included in the calculation, and I understand your

17   position to be that the amount of drugs proven at trial was

18   less than the amount included in the presentence report.

19        Would you like to address that now?

11:44:48 20        MR. RAY:  Very briefly.  What the position is that

21   if the court goes back and looks at the trial testimony from

22   Fred Alston, the court will recall that he was the gentleman

23   who was Mr. Mack's brother-in-law, I believe.  He came in

24   and he testified that there was 10 grams, 7 grams and 3

11:45:09 25   ounces which he had a transaction with Mr. Mack.

Lori A. Callahan, RMR-CRR      (330) 252-6022

1        It's our position that would be the inclusion of

2   the sale of drugs to be -- that should be calculated in this

3   case for purposes of the amount of drugs sold by Mr. Mack.

4        THE COURT:  Very well.  Thank you, Mr. Ray.

11:45:25  5        I will ask you to use one of those two microphones

6   at the table just to help the court reporter as we go along.

7        MR. RAY:  Okay, Judge.

8        THE COURT:  Ms. Brennan?

9        MS. BRENNAN:  Sure.  Thank you, Your Honor.  The

11:45:34  10  government recalls Fred Alston's testimony a bit differently

11  and certainly with respect to the statements he had provided

12  to law enforcement that were produced prior to his

13  testimony.  His statement was that when you totalled all of

14  it up, it was 194 grams of cocaine, so we believe that that

11:45:49  15  amount is correct with respect to the cocaine.  And if we

16  need to, we can move on to the heroin amounts.

17        THE COURT:  Yes.  Why don't we do both of these at

18  the same time.

19        MS. BRENNAN:  With respect to the heroin, Your

11:46:00  20  Honor, we put this in our sentencing memorandum.  This is

21  how we went through it, and we did a very conservative

22  approach because we used Government's Exhibit 63, which was

23  the defendant's cell phone that he obtained on March 3 of

24  2013.

11:46:17  25        And we know that he had been distributing heroin

Lori A. Callahan, RMR-CRR        (330) 252-6022

and cocaine since December, actually, November, according to

Ashley Onysko, so we know that we are missing several months

of his operation.  But just looking at Government's Exhibit

63, starting with March 3, what we did for four people

11:46:35  identified as heroin users, Victim Number 4, Victim Number

1, Victim Number 3 and Monica Freedman who testified here as

a defense witness, what we did is we took the first time

they texted the defendant a debt amount, and then we took

line by line through Government's Exhibit 3 and we added up

11:46:57  all of the debt increases, and then we took that number,

that total dollar number and divided it by 200, and the

reason we divided it by 200 is because witnesses testified,

specifically Cory Tino, that the defendant's price for one

tenth of a gram of heroin was $20.

11:47:16       So taking that number and doing that division, we

were able to establish just on those four people that he

distributed heroin between March 3, 2013 and April 9, 2013

to the amount of 105.41 grams.

      Now, we know from Government's Exhibit 61, that on

11:47:38  February 3, 2013, he also had an additional 2.6 grams of

heroin.  We also know that as we went through for a Sara

Crabtree and Katie Frioud, we did the same analysis between

March 31, 2013 and April 9, 2013, they purchased $1,620

worth of heroin which equates to 8.1 grams.  We also did an

11:48:04  analysis with respect to Carly Hribar.  She was between

1    March 19, 2013 and March 30 of 2013.  She purchased $1,217

2    worth of heroin.  That equates to 6.085 grams.  And with

3    that, if you add in those amounts, and .16 of heroin that

4    Ashley Onysko had on her on April 9, 2013 we know came from

11:48:31  5    the defendant, the total, taking all of that into

6    consideration, would be 121.855 grams of the heroin.

7              Again, I would just reiterate to the court, that's

8    just a very small snapshot.  That's one month out of what is

9    about a four-month scheme to distribute heroin and cocaine.

11:48:49 10              THE COURT:  And that information is all taken from

11   the exhibits admitted into this trial as the drug debt owed

12   by some of the individuals involved in the case?

13              MS. BRENNAN:  Absolutely.  Those numbers come

14   strictly from Government's Exhibit 61 and Government's

11:49:07 15   Exhibit 63.

16              THE COURT:  All right.  I will ask you to

17   reiterate your calculation how you arrived at your

18   calculation relative to the cocaine.

19              MS. BRENNAN:  With cocaine, it was based

11:49:17 20   Mr. Alston's testimony here at trial.  I recollect it

21   differently from defense counsel, and also the previous

22   statements that he had provided though to law enforcement.

23   He had given another two statements with respect to the

24   defendant, both of which were provided with Jencks, and he

11:49:33 25   indicated that it was 100 -- when you totalled it up, it was

1    194 grams of cocaine that he gave to the defendant, the

2    first time being within a day or two of the defendant being

3    released from the Bureau of Prisons.  So it's less than 200

4    grams of cocaine, but more than 100 grams of cocaine as set

11:49:54  5    forth in --

6              THE COURT:  And what do you recall his testimony

7    as in this case?

8              MS. BRENNAN:  I recalled him talking about --

9    there was more -- there were two three-ounce transactions, I

11:50:05  10   remember that specifically, which I know comes up over this

11   and there was a 10-gram, and I didn't break it down here, I

12   think there was another 10-gram transaction, but there were

13   multiple times.

14             But I -- specifically there was more than just a

11:50:19  15   one three-ounce transaction.  He testified that there were

16   two three-ounce transactions.  I am conferring with the

17   agent who was with me during the proffer for the amount, so

18   that agent and I both agree that the total amount would be

19   194 grams of cocaine from Fred Alston to the defendant.  We

11:50:38  20   don't have any evidence the defendant used the cocaine.  In

21   fact, all the evidence is to the contrary.  He distributed

22   it.

23             THE COURT:  Mr. Ray.

24             MR. RAY:  Thank you, Your Honor.  I didn't want to

11:50:47  25   interrupt the government's attorney.  But I will put on the

1    record now that on behalf of Mr. Mack, we would ask -- and

2    the court can inquire of him if it wants, he would ask we

3    withdraw our objection as it relates to the heroin, to the

4    amount of heroin.  My understanding is there's no problem

11:51:07    5    with the amount as set forth in the PSR as it relates to the

6    heroin.

7            THE COURT:  I see.  So that is what the court will

8    permit you to withdraw.  And particularly, based upon the

9    conservative calculation that was provided by the

11:51:19    10    government, the court agrees that those amounts are

11    reflected in those exhibits.

12            MR. RAY:  Correct.  My only other thought as it

13    relates to the cocaine in this matter, and I will -- I am

14    sure the court is aware that during the course of a trial,

11:51:34    15    everybody hears things differently, so I made my

16    determination on the amount of cocaine that was attributed

17    to the testimony of Mr. Alston based upon what I believe to

18    be Mr. Whitney's cross-examination of him.  So that's where

19    I gleaned my thought from.

11:51:50    20            As is set forth in the PSR, they've attributed to

21    400 to 500 grams of cocaine to Mr. -- to this case, and we

22    would suggest that that was too much, and we would refer to

23    the court.

24            THE COURT:  They're now for purposes of the

11:52:13    25    hearing suggesting 194.

Lori A. Callahan, RMR-CRR        (330) 252-6022

1      MR. RAY:  No, I do understand that.

2      THE COURT:  So that there's no objection as to

3   that amount?

4      MR. RAY:  No.  We will just go back to our

11:52:22  5   original thought, Judge, as far as what Mr. Alston -- was

6   our recollection of the testimony.

7      THE COURT:  I see.  All right.  So you were

8   quibbling with the higher amount, the 400 to 500?

9      MR. RAY:  Correct.

11:52:35  10      THE COURT:  So if it's modified to reflect the

11   194, that resolves the issue?

12      MR. RAY:  I believe it would, Judge, yes.

13      THE COURT:  Okay.

14      MS. BRENNAN:  I would just point out, Your Honor,

11:52:48  15   just the distribution of the heroin alone gets us to a base

16   offense level of 26 under 2D1.1.

17      THE COURT:  Well, the fact of the matter is -- and

18   I am going to make this point as soon as I make a ruling on

19   the objection, the fact of the matter is that the way that

11:53:06  20   the offense level is calculated in this case as to these

21   offences, it does not impact the calculation -- the

22   guidelines calculation, so I want to make that clear.

23      So even though I am hearing this objection, I want

24   to make it perfectly clear for anyone who's reviewing this

11:53:26  25   matter that whatever the calculation is as to the drugs, it

1    does not -- because the way the offenses are grouped, it

2    will not impact the guideline sentence.

3            MR. WHITNEY:  Your Honor, we will agree with that,

4    but just so the record is also clear, the reason why we make

11:53:47  5    objections, not only on his case or but on other cases,

6    these presentences have impact on his housing, on his -- as

7    you know.

8            THE COURT:  Absolutely legitimate.  And that's why

9    I am allowing the objection to come in.  That's why we're

11:54:03  10    discussing it.  But I want to make it clear for sentencing

11    purposes and guideline purposes, this is not going to have

12    an impact.

13            So, yes, there are many purposes for which the

14    presentence report is used, and that's why I am taking all

11:54:14  15    this time to make sure that the wording is correct and

16    accurate, and so I will ask probation to go ahead and modify

17    it based upon the agreement now of counsel for the 194 grams

18    of cocaine, the amount of heroin is as it stands.  And none

19    of this will change the calculation in the report as it

11:54:35  20    pertains to the drugs, number one.  And number two, the drug

21    calculation in the report does not impact the guideline

22    sentence.

23            Everyone agreed?

24            MR. RAY:  Yes, Your Honor.

11:54:49  25            MR. WHITNEY:  Yes.

Lori A. Callahan, RMR-CRR      (330) 252-6022

1          THE COURT:  So that objection is resolved.

2          Now, since it's -- since the -- the next report or

3     the next objection in the report deals with paragraph 51 of

4     the report, let's see, sometimes these numbers change, and

11:55:25   5     you're objecting to the information contained in paragraph

6     21 because Mr. Mack is indicating that he did not -- it's

7     his position that he did not instruct his son, Toby, to lie

8     to the grand jury, but paragraph 51 in the report --

9          MR. RAY:  Your Honor, I think you had referred to

11:55:54  10     paragraph 21.  I believe it's 51.

11          THE COURT:  No, 51.  I hope it didn't come out as

12     21.  If I said 21, the court meant to say 51.

13          MR. RAY:  As it relates to any argument as to this

14     objection, I believe it was set forth in our objections, as

11:56:12  15     well as our motion, our sentencing memorandum, our position,

16     and we would simply ask the court to make a determination

17     based upon what you feel is the right decision in this case.

18          THE COURT:  All right.  Ms. Brennan.

19          MS. BRENNAN:  Your Honor, I mean he was found

11:56:34  20     guilty of this count, and it was clear from the testimony

21     and the court got to hear the call.  He told his son Toby to

22     go into the grand jury and to "Stick with the script," and

23     "To tell them you don't know what I was doing," which we've

24     got the text messages and we've referenced one of those in

11:56:50  25     our sentencing memorandum.  The court got to hear from

Lori A. Callahan, RMR-CRR          (330) 252-6022

1   Ashley Onysko and others who were in the house.  Toby Lewis

2   knew exactly what his dad was doing.  He knows it because he

3   is using his son to help him with his sex trafficking and

4   drug trafficking enterprise, so that is an absolute accurate

11:57:06   5   statement.  It's consistent with the testimony that came

6   here in trial, and it's consistent with the jury's verdict,

7   Your Honor.

8           THE COURT:  All right.  Anything further on the

9   issue, Mr. Ray?

11:57:13   10           MR. RAY:  On behalf of Mr. Mack, he appreciates

11   the fact that he was convicted of this count, Judge.  It

12   simply remains his position that he did not request that his

13   son lie to the jury.  Thank you.

14           THE COURT:  Very well.  The court is going to

11:57:24   15   overrule the objection.  The recording and the testimony

16   really do speak for themselves here and perhaps even more so

17   the jury's verdict sort of puts this issue to rest, as well.

18           So next, I think, Mr. Ray, we finally get to the

19   argument you would like to address.

11:57:57   20           MR. RAY:  Okay.

21           THE COURT:  And that's with respect to the

22   four-level upward adjustment in the role in the offense.

23           MR. RAY:  Thank you, Your Honor.  May it please

24   the court.  Specifically we're looking at United States

11:58:11   25   Sentencing Guideline 3B1.1 where it says, "If a defendant

Lori A. Callahan, RMR-CRR        (330) 252-6022

1    was an organizer or leader of a criminal activity that

2    involved five or more participants or was otherwise

3    extensive, increase by four levels."

4          If you look at the notes specifically application

11:58:29  5    note 1 to 3B1.1, Judge, it defines participant.  Participant

6    specifically is a person who is criminally responsible for

7    the commission of the offense, but need not have been

8    convicted.

9          THE COURT:  Yes.

11:58:43 10          MR. RAY:  In this case, Your Honor, early on, the

11   government identified the individuals who were going to be

12   testifying in this case, specifically who were in the

13   indictment as victims.  They never referred to them as

14   criminal responsibility.  There was a clear position of the

11:59:03 15   government that they were not going to be charging these

16   individuals.  Rather, they saw them as throughout this

17   entire trial as being victims.

18          I think that under this note, that you have to

19   look at specifically, and I believe that if you do, the

11:59:21 20   young ladies are not participants in this case, but they're

21   victims, and if you look at the note, I don't think you can

22   correlate the two.

23          In the government's memorandum, they look at other

24   individuals that they believe could possibly qualify as a

11:59:36 25   participant.  And if you look at a number of the individuals

1    that they've mentioned, specifically they talk about

2    Ms. Hribar, Ms. Crabtree, Ms. Freedman and Ms. Frioud, and

3    they talk about the facts that those individuals purchased

4    drugs from Mr. Mack.

11:59:59   5         If you look at the notes, specifically, if you

6    look at comment note 3 to the guidelines, it specifically

7    talks about the buyer/seller relationship, and in that

8    section, it says that "A defendant who has sold a controlled

9    substance to another in an arms-length transaction has not

12:00:20  10   organized or led the buyer and thus 3B1.1 adjustment is not

11   warranted."

12        So I don't think in this situation, Judge --

13        THE COURT:  Well, except you're limiting it to the

14   buying of the drugs, but the testimony of these individuals

12:00:40  15   identified by the government in the government's memorandum

16   goes beyond just simply purchasing drugs.  It goes into

17   actually transporting the victims to appointments or

18   transporting, in some instances, the minor victim to her

19   home or picking her up from her home, and also, I think one

12:01:04  20   of the witnesses was sort of looking out for your client, as

21   well, and reporting things back to him that she might have

22   heard others say or heard on the streets to try to keep him

23   -- protect him or keep him out of danger as he operated his

24   organization.

12:01:24  25        So they're pointing to more -- the government

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    points to more testimony than just the isolated, "Oh, and by

2    the way, we purchased drugs from Mr. Mack."

3              MR. RAY:  I agree.  I mean, in their brief, they

4    do talk about more than that.

12:01:41  5              THE COURT:  That was, in fact, the testimony.

6              MR. RAY:  It was, that there was a purchase of

7    drugs.

8              THE COURT:  No.  That there was a purchase of

9    drugs and also this other participation in the organization

12:01:52 10    and assisting the organization.

11              MR. RAY:  I agree, and there was this testimony.

12    The question is, is whether or not under 3B1.1, if you look

13    at the definition of participant, whether or not any of

14    these other individuals who's criminally responsible, and

12:02:05 15    that's what the note keeps going back to, and participant is

16    whether a person is criminally responsible for what the

17    actions --

18              THE COURT:  I see what you're saying.

19              MR. RAY:  So you have the criminal conduct of

12:02:15 20    these arms-length transactions for the sale of drugs.  My

21    understanding of the notes in the case law is that in and of

22    itself does not create the criminal liability.  So you have

23    to then take a second step.  Is the actions of driving

24    individuals to these appointments, is that a criminal action

12:02:34 25    that would -- does that create criminal liability that would

1    justify a finding under the 3B1.1 that these are indeed

2    participants?  And it is the position of Mr. Mack and the

3    defense is that these do not qualify as participants.  So

4    there's not a four-level enhancement that would apply in

12:02:54  5    this case, and we would suggest to the court that that's an

6    inappropriate application.

7         THE COURT:  Thank you.

8         MR. RAY:  Thank you.

9         MS. BRENNAN:  Thank you, Your Honor.  The

12:03:00  10    government stands by its sentencing memorandum on this

11    issue.  The court is correct in noting that we identified

12    six individuals in our sentencing memorandum as people that

13    are participants.  They don't have to be criminally charged,

14    but they have to facilitate and participate in criminal

12:03:16  15    conduct.

16         With respect to Ashley Onysko and Toby Lewis,

17    there doesn't appear to be any question there.  The

18    challenge appears to be on Carly Hribar, Sara Crabtree and

19    Monica Freedman and Katie Frioud.  For each of those

12:03:29  20    individuals, in addition to purchasing drugs from this

21    defendant, they did other things to knowingly participate

22    and facilitate in his conduct.  With respect to Carly

23    Hribar, she drove Victim Number 2, a minor, to the hotel,

24    the Camelot Motel, and sat outside and waited for that

12:03:46  25    commercial sex act to be over and knowingly drove her back

Lori A. Callahan, RMR-CRR        (330) 252-6022

1    to 8 Tattersal.  She was here.  We asked for a sidebar

2    during the trial.  We had never had an opportunity to speak

3    with her to make sure she understood that she was a

4    participant in criminal conduct and she was advised, as we

12:04:03  5    understand it, of her Fifth Amendment right, which we

6    believe she invoked.

7         With respect to Sara Crabtree, she purchased

8    drugs.  She also would advise him when people -- she

9    believed people might snitch on him and then she facilitated

12:04:17  10   him in identifying the rates of motels and hotels, and there

11   is even Government's Exhibit 25-40, which was a snapshot

12   of -- it's a two-page document.  On the left side of that

13   photograph are hotels and motel information with hourly

14   rates and longer-term rates.  At the bottom of that, she has

12:04:36  15   actually signed the document, Sara Crabtree, and she put

16   2013 and there's even a little drawing I think of two girls

17   around a heart.

18        The second page in that picture is also a listing

19   of the -- I think it's the Foxy Yahoo account that was used

12:04:53  20   to place Backpage ads and the password with that account.

21   So the E-mail addresses that were used to post these ads,

22   that's listed out in the -- or the second piece of paper in

23   that photograph.

24        With respect to Monica Freedman, she testified in

12:05:08  25   addition to buying drugs from him, she also drove people

1    back and forth to appointments to engage in commercial sex

2    acts at his direction.

3            In fact, with respect to Victim Number 4, she

4    drove Victim Number 4 back to Tattersal Court while Victim

12:05:23  5    Number 4 cried and said how afraid she was to go back to the

6    defendant.

7            With respect to Katie Frioud, we had Government's

8    Exhibits 31-1 to 31-5.  It was a Backpage ad for Victim

9    Number 4, and in that one, and Ms. Frioud testified to it,

12:05:39 10    she knowingly gave the defendant her prepaid -- I will call

11    it a debit card, her prepaid debit card number so that he

12    could use that to place Backpage ads for Victim Number 4 to

13    engage in commercial sex acts.

14            Your Honor, the evidence at trial supports that

12:05:54 15    these four individuals were more than just people who

16    purchased drugs from the defendant.  They participated in

17    the crime.  That amounts to six participants, one more than

18    the actual five required by 3B1.1.  We would ask the court

19    to impose the four-level enhancement, Your Honor.

12:06:13 20            THE COURT:  Mr. Ray.

21            MR. RAY:  Your Honor, I would agree with the

22    government that you don't have to be charged with a crime in

23    order to be a participant, but in order to be a participant,

24    you specifically have to have criminal liability.  You have

12:06:27 25    to be what they call criminally responsible for the

1    commission of the offense.

2            So in other words, is the fact that someone drove

3    this victim who is not included -- is not going to be

4    charged in this case, is the fact that someone drove that

12:06:43    5    person to a hotel room, is that a criminal responsibility

6    that would make them a participant for the four-level

7    enhancement?  And it remains our position that it does

8    not -- the individuals they've listed here do not rise to

9    the level of a participant as set forth in the guidelines.

12:07:03   10    Specifically, we refer the court to note 1 of the

11    application notes where it defines participants.  The

12    actions of the individuals that the AUSA has discussed here

13    simply do not rise to criminal responsibility that would

14    make them a participant, and we would ask the court find

12:07:25   15    that the four-level enhancement does not apply.

16            THE COURT:  Ms. Brennan, if you could address the

17    defendant's argument relative to application note 1, in

18    particular.

19            MS. BRENNAN:  Your Honor, I would just cite the

12:07:40   20    court to United States versus Anthony, it's a Sixth Circuit

21    case from 2002, participants are people who were, one, aware

22    of the criminal objective, and two, knowingly offered their

23    assistance.  We have that with respect to the four that I've

24    specifically discussed here in court today.  They all knew

12:07:57   25    exactly what he was doing with respect to the drug

1    trafficking enterprise and the sex trafficking enterprise.

2    They were all knowing participants, fully aware of the

3    objective, getting these victims back and forth to hotel

4    rooms and returning them to this defendant crying because

12:08:12  5    they did not want to go back to him.  That would be Monica

6    Freedman.

7            Carly Hribar, she took a -- you got to see Victim

8    Number 2.  She took that girl, that 16-year-old girl to a

9    motel so that she could engage in a commercial sex act at

12:08:29  10   6:00 in the morning.  She sat outside and waited for her to

11   be done and drove her back to his house.

12           Your Honor, these four women that we've

13   identified -- I'm sorry?

14           Any one of them could have been charged.  In fact,

12:08:48  15   we took it upon ourselves with respect to Ms. Hribar to say

16   that she needed to be advised of her Fifth Amendment right.

17   Any one of them could have been charged under 371, under an

18   aiding and abetting theory.  Certainly with respect to

19   Hribar, she could have had only 1591 charge with respect to

12:09:06  20   taking that minor to the Camelot Motel.  We believe the

21   four-level enhancement is certainly appropriate here.

22           MR. WHITNEY:  May I add something, Your Honor?

23           THE COURT:  You certainly may.

24           MR. WHITNEY:  The U.S. Attorney's Office for this

12:09:18  25   district took a stand early on in this case, a public stand,

1   that these people are victims.  Although they participated

2   in criminal acts, they're victims and not to be treated --

3   "Victims of crime will be treated accordingly," a public

4   statement that the U.S. Attorney's Office made early on in

12:09:40   5   this case.

6          THE COURT:  Are you perhaps confusing that with

7   the four victims identified in the indictment?

8          MR. WHITNEY:  They are.  They could have indicted

9   those people.  They didn't indict those people because they

12:09:53   10   treat them as victims, not as participants.

11          THE COURT:  So all right.  And I appreciate your

12   point, but they're not even including the four victims in

13   the count.

14          MR. WHITNEY:  They're not.  I am moving on to

12:10:04   15   Carly Hribar and the others.

16          THE COURT:  I see.

17          MR. WHITNEY:  Who could have been indicted and

18   they just admitted they could have indicted there.  But they

19   didn't indict these girls because their office took the

12:10:13   20   position that they're not criminally responsible, they are

21   victims.  And, therefore, that's our point, is how do you

22   define the word "participant"?  I think it's extremely gray

23   here.  And they have decided that they are not criminally

24   responsible.

12:10:32   25          THE COURT:  And I do appreciate the argument that

1    you're making; however, they weren't identified in the

2    indictment as victims, either, so they didn't -- they didn't

3    identify them as victims.

4            MR. WHITNEY:  But we know they weren't criminally

12:10:44  5    responsible because they're not named in the indictment,

6    period.  The government took that position.

7            THE COURT:  Well, I believe that it does not

8    require to be a participant under this aggravating role

9    enhancement.  There's no requirement that they be charged.

12:11:08  10            MR. WHITNEY:  Agreed.  So that's not necessary.

11            THE COURT:  They could have been charged.  The

12    strength of the case makes no difference on whether, you

13    know, they were charged or not charged, but they certainly

14    weren't identified as victims --

12:11:25  15            MR. WHITNEY:  They weren't, but -- well, I don't

16    know how --

17            THE COURT:  -- in the indictment, in the

18    superseding indictment.

19            MR. WHITNEY:  Right.  But they --

12:11:35  20            THE COURT:  We have four victims in the

21    superseding indictment.

22            MR. WHITNEY:  And I think the evidence is clear

23    that they were treated as not being criminally responsible,

24    because they weren't indicted, except for when we're talking

12:11:45  25    about enhancing this man for four levels.  Now they're

1    somehow criminally responsible for that purpose because the

2    statute guideline requires it.  That's our problem.

3              MS. BRENNAN:  Your Honor, these women are not

4    victims.  We have never ever identified these women as

12:12:02    5    victims.  In fact, the court had an opportunity to see us

6    cross-examine some of these women.  They're not victims.

7              And the superseding indictment, Count 1, the 371

8    count even says -- it identifies the defendant and Ashley

9    Onysko and others, known and unknown to the grand jury.  Had

12:12:17   10    we wanted to, we could have added any one of these women in

11    there as a 371 defendant.

12              THE COURT:  Thank you.  Mr. Laffin?

13              PROBATION OFFICER:  Yes, the Guideline 3B1.1(a) is

14    two prongs.  It involves five or more participants or was

12:12:36   15    otherwise extensive.

16              THE COURT:  Right.  I think right now -- and I

17    appreciate that there are two ways to get to the

18    enhancement.  I think if I understand the government's

19    position, they're saying the court doesn't even have to do

12:12:48   20    the otherwise extensive prong, if you will, or add anew to

21    the enhancement, because it is satisfied by involvement of

22    five or more participants.

23              You also argue in your briefing that you could get

24    to the extensive -- otherwise extensive prong just because

12:13:12   25    of the nature of the operation.  So you do, I believe, make

Lori A. Callahan, RMR-CRR       (330) 252-6022

1    that argument alternatively because you set forth the test

2    in your brief; yes?

3            MS. BRENNAN:  I do, Your Honor.  I set it out in

4    the first paragraph under subsection A.

12:13:31  5            THE COURT:  Yes.  So there are two ways, and I

6    was -- what we were doing for the purposes of this argument

7    was focusing on the five or more participants.

8            Interestingly enough, in the court's research on

9    this issue, the Sixth Circuit has said that, first of all,

12:13:49 10   in order to qualify for the four-level enhancement under

11   3B1.1(a), a defendant need not directly supervise five or

12   more participants.  It's enough that he directly supervised

13   one participant in criminal activity that involved five or

14   more participants and that's United States versus

12:14:11 15   Morales-Martinez, which is a 2013 case, where the court

16   said, "A defendant whose sentence is enhanced under 3B1.1(a)

17   or (b) need not directly supervise more than five persons so

18   long as the defendant exerted some level of control or

19   influence over at least one of five or more persons involved

12:14:35 20   in the criminal activity."

21           So what the court finds, first of all, Mr. Mack

22   was involved in the operation; Ms. Onysko was involved in

23   the operation; Mr. Lewis, Mr. Mack's son, Toby Lewis, was

24   involved in the operation and I don't think anyone, anyone

12:15:01 25   here is disputing that, correct?

Lori A. Callahan, RMR-CRR      (330) 252-6022

1          MS. BRENNAN:  The government certainly is not,

2     Your Honor.

3          THE COURT:  So I hear no dispute coming, because

4     there were no arguments relative to those three individuals.

12:15:13  5          MR. RAY:  Your Honor, I would agree with that

6     based upon the evidence.  We would not disagree.

7          THE COURT:  So the court has heard the testimony

8     as to the involvement of the others mentioned, Sara

9     Crabtree, Monica Freedman, Katie Frioud, Carly Hribar, and

12:15:31 10     they did participate.  They did provide valuable service to

11     the operation when Ms. Onysko was unable to transport others

12     or were unable to transport the victims to their

13     appointments, they transported them to the appointments.

14          They also, as the government pointed out,

12:15:55 15     permitted Mr. Mack to use in Katie Frioud's case, her debit

16     card -- I believe they were debit cards, or some sort of

17     credit, credit card or debit card to make payments.  The

18     government's also set forth very nicely in the briefing

19     other acts that these four individuals performed as a

12:16:28 20     participant in the organization, and there was a point where

21     Ms. Hribar was notified of her rights and I believe chose

22     not to testify in this case after she was -- I think she was

23     already on the stand when she was advised.

24          So each of them performed acts that advanced the

12:17:05 25     criminal activity of the organization, and just with respect

                    Lori A. Callahan, RMR-CRR        (330) 252-6022

1    to those four individuals and the three others, Mr. Mack,

2    Ms. Onysko, and Mr. Lewis, you've met the five or more

3    participants.

4         Additionally and separately, there is an argument

12:17:32    5    to be made that the victims, too, were participants, but we

6    don't even have to get there.  We don't even have to get to

7    that argument, because we already meet the required number.

8    There was, just by way of making this point, there was a

9    case where the government argued for the enhancement under

12:18:00   10    3B1.1(c), this is out of the Seventh Circuit, based entirely

11    on victim involvement and relying upon a Sixth Circuit

12    decision in United States versus Carroll, that court said

13    no, you can't just rely solely on the victims, but the

14    criminal activity must be with at least one other criminally

12:18:25   15    culpable person.

16         Here we have more than one other criminally

17    culpable person when you look at Ms. Onysko and Mr. Lewis

18    alone.  So that there might even be a viable argument that

19    the victims should also be counted in the number, all to say

12:18:46   20    that without -- without even having to get to the otherwise

21    extensive argument or avenue to this enhancement, the court

22    finds that the enhancement applies based upon the five or

23    more participants -- organizer or leader of criminal

24    activity that involved five or more participants.  So with

12:19:09   25    that, the objection is overruled.

Lori A. Callahan, RMR-CRR        (330) 252-6022

1      I should say for purposes of the record because

2    Sixth Circuit law does require the court to identify other

3    participants that have been identified here and Mr. Mack,

4    Ms. Onysko, Mr. Lewis, Ms. Crabtree, Ms. Freedman,

12:19:32   5    Ms. Frioud, Ms. Hribar, and then over and above that, the

6    four victims.  And in the sentencing memorandum, there's a

7    detailed report.

8           Excuse me one moment.

9           (Pause.)

12:20:09  10           THE COURT:  So in any event, no matter how you

11    look at it, the five participants are met with the six

12    individuals that were set forth in the government's

13    sentencing memorandum.

14           Anything further on that issue?

12:20:32  15           MS. BRENNAN:  No.  Thank you, Your Honor.

16           MR. RAY:  No.  Thank you, Judge.

17           THE COURT:  I'm sorry, it's actually seven

18    individuals.  I can't even -- it's Mr. Mack, Ms. Onysko, Mr.

19    Lewis, Ms. Crabtree, Ms. Freedman, Ms. Frioud and Ms.

12:20:43  20    Hribar, seven individuals.

21           Next objection -- and I will say this:  Even if

22    the four-level increase doesn't apply pursuant to Section

23    3B1.1, the offense level is a 48.  So even if the court did

24    not apply a four-level increase pursuant to Section 3B1.1,

12:21:31  25    it's still a level -- offense level 44, which is still

1    greater than the highest offense level in the sentencing

2    table, so I want to make that point clear.

3         Next objection deals with the two-level upward

4    adjustment for obstruction of justice.  Now, when this

12:22:00  5    objection was originally lodged, there was a different

6    calculation set forth by the probation department in the

7    prior presentence report.  When the report was updated on

8    June 5, that same -- there was a different calculation

9    employed and there was a separate calculation for the

12:22:33 10    obstruction.  So I'm not sure if their objection even stands

11    today.

12         So I will ask Mr. -- you understand what I am

13    saying?  They're using a different formula when they revised

14    the report.

12:22:46 15         MR. RAY:  Judge, I understand what they did when

16    they revised the report.  I guess we would remain in our

17    position that since he has been convicted of Counts 8 and 9,

18    that no matter how they wanted to revise the reports, the

19    two-level enhancement still should not apply since he has

12:23:03 20    been convicted of Counts 8 and 9, which are the obstruction

21    counts.  Rather than count them as a group, they simply

22    eliminated that and then included the two-level enhancement,

23    and we would object to that being done that way.

24         THE COURT:  Ms. Brennan?

12:23:27 25         MS. BRENNAN:  Your Honor, we have reviewed this

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    and certainly reviewed the change.  The way probation has

2    done it in this report is consistent with 3C1.1 and

3    specifically its application note 8.  So this -- the way

4    they have calculated it here is correct.  They have added

12:23:41  5    the two levels on to the underlying offenses for which the

6    obstruction involved, and he's not getting hit with any

7    additional levels for the separate counts of conviction

8    under 8 and 9.

9            So under application note 8 in 3C1.1, this is

12:23:57  10   pretty standard, Your Honor.

11           THE COURT:  Mr. Ray?

12           MR. RAY:  Nothing further, Judge.  Thank you.

13           THE COURT:  I believe that the calculation is

14   performed properly, applied properly pursuant to the

12:24:18  15   Guideline 3C1.1, as well as the government mentioned comment

16   8, so the court overrules that objection.

17           And I believe we've now addressed all the

18   objections that were set forth by the defendant.

19           MR. RAY:  That is correct, Your Honor.

12:25:39  20           THE COURT:  I just -- because I want to clarify

21   the record since we've spent so much time going over these

22   objections, in the objection dealing with 3B1.1(a), I made a

23   reference to a Seventh Circuit case, I didn't even cite the

24   name of the case, and as I look back at the 3B1.1(c), that

12:25:59  25   was dealing with the lowest level of enhancement and that's

1    why it was only a need to have one other criminally culpable

2    person.

3         So I'm going to back off of my statement relative

4    to the victims completely in this case and just rely upon

12:26:20   5    solely, solely, the seven individuals I previously

6    identified in the record so as to alleviate any potential

7    confusion or error.  So it's just Mr. Mack, Ms. Onysko,

8    Mr. Lewis, Ms. Crabtree, Ms. Freedman, Ms. Frioud,

9    Ms. Hribar and that's it.  All right?  Taking the other

12:26:47  10    piece off the table.

11         Anything further now?  Any other objections,

12    corrections, deletions, amendments, whatsoever to the

13    presentence report as it now stands based upon the court's

14    rulings?

12:27:01  15         MS. BRENNAN:  No, Your Honor.  Thank you.

16         MR. RAY:  No, Your Honor.  Thank you.

17         THE COURT:  All right.  So next we will advise --

18    or proceed to review the sentencing options beginning with

19    the advisory sentencing guideline calculation.

12:27:17  20         Now, once, again, there has been a complete

21    revision of the presentence report as of June 5 with a new

22    series of calculations and there are groupings involved in

23    these calculations and there are actually five groups.

24    Counts 1 and 2 are grouped together as group 1; Count 3,

12:27:50  25    group 2; Count 4, group 3; Count 5 is grouped separately as

Lori A. Callahan, RMR-CRR        (330) 252-6022

1    group 4.  And finally, Counts 1, 6 and 7 are grouped

2    together and designated as group 5.  So we have five

3    different groupings.

4          The calculations that the court will use are

12:28:15  5    accurately now set forth in this version of the report.  And

6    I will ask counsel if you have had adequate time now to

7    review the offense level computations as set forth in the

8    presentence report filed on June 5, 2014 to understand the

9    calculations that the court will employ in this case?

12:28:42  10          MS. BRENNAN:  We have, Your Honor.  Thank you.

11          MR. WHITNEY:  We have, too, Judge.

12          THE COURT:  Okay.

13          MR. WHITNEY:  Other than our objections we already

14    made to the other --

12:28:52  15          THE COURT:  Right.  To the enhancements.

16          MR. WHITNEY:  Correct.

17          THE COURT:  The court has made its ruling, and so

18    based upon the court's ruling now, this is, in fact, the

19    formula the court will be using to arrive at the offense

12:29:11  20    level in this case.

21          So the court is simply -- because it's so complex

22    and because they're written out here in paragraphs 56

23    through 96 of the report, the court is simply going to adopt

24    the calculations as contained in the presentence report and

12:29:35  25    ask counsel if you have any questions as to how the combined

1  adjusted offense level of 48 was reached and then because

2  obviously the offense level can't be higher than 43, it is

3  then capped off at 43.

4          Any objection or -- let me say, is there any

12:29:57  5  misunderstanding as to how this calculation works or any

6  question as to how the question works and what the court is

7  adopting as its own calculation of the offense level in this

8  case?

9          MS. BRENNAN:  The government has no questions and

12:30:12  10  completely understands the calculation.

11          MR. WHITNEY:  Likewise, Your Honor.

12          THE COURT:  Okay.  So next I would just like to

13  note for the record that Mr. Mack has previously been

14  convicted of the following felonies as referenced in the

12:30:37  15  report:  Drug trafficking, I am hoping that it remains the

16  same paragraph number, 110.  Let me see.  It did not, of

17  course.

18          So it's drug trafficking, which is now paragraph

19  111 in the report.  Also another drug trafficking count

12:31:16  20  reflected in 114; trafficking in cocaine reflected at 116;

21  conspiracy to possess with intent to distribute cocaine

22  reflected in paragraph 119.  Since Mr. Mack was 18 years or

23  older at the time the instant offenses were committed and

24  the instant offenses involved controlled substances and

12:31:48  25  crimes of violence, Mr. Mack qualifies as a career offender

1     within the meaning of Guideline 4B1.1, which would typically

2     mean in most cases that his offense level would be higher

3     except in this case, it's not the case.  So even he

4     qualifies as a career offender, his offense level is higher

12:32:15  5     just based upon application of other guidelines in this

6     case.  So I just want to make it clear that he does qualify

7     as a career offender, but it has no impact on his offense

8     level in this case.

9          Any questions about that?

12:32:32  10          MS. BRENNAN:  No, Your Honor.

11          MR. WHITNEY:  No, Your Honor.  Thank you.

12          THE COURT:  So next, Mr. Mack's criminal history

13     computation.  It's discussed at paragraphs 98 through 126 of

14     the report.  His criminal conviction produce a criminal

12:32:57  15     history score of 15.  Because Mr. Mack committed the instant

16     offense while under a criminal justice sentence in his 2005

17     case from this district, two points are added, making the

18     total criminal history score 17, which corresponds to a

19     criminal history category of VI.  The advisory guideline

12:33:19  20     sentence of an offense level 43 and a criminal history

21     category of VI is life.

22          I will note that the maximum statutory sentence

23     for Count 1 is 60 months.  The maximum statutory sentence

24     for each of Counts 2 through 5 is life and the maximum

12:33:40  25     statutory sentence for each of Counts 6 through 9 is 240

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    months.

2           So with that, is there any objection to the

3    court's calculation of the advisory sentencing guideline in

4    this case, which, again, is life?

12:34:01  5           MS. BRENNAN:  No, Your Honor.

6           MR. WHITNEY:  Again, without waiving the

7    objections we had which led to the court's rulings here, we

8    would agree.

9           THE COURT:  Okay.  As I said before, even if the

12:34:14 10    court did not apply the four-level -- the four levels for

11    the organizer as a role in the offense, it would still be

12    life.  Now, if the court didn't apply either of those two

13    that you're objecting to, it's four and the two-level

14    enhancement for obstruction then, of course, that would make

12:34:40 15    it 360 to life and let me just say at this point, I've

16    already overruled those objections.  The one makes no

17    difference, and it's only if both objections would have been

18    sustained that it would have made a difference.

19           So with that, any questions regarding those

12:34:59 20    issues?

21           Now, the remainder of the sentencing options are

22    once again set forth in detail in the report, and the court

23    is simply going to adopt the remainder of the report noting

24    that there is a special assessment of $900, which is

12:35:17 25    mandatory, but all the other sentencing options are set

Lori A. Callahan, RMR-CRR      (330) 252-6022

1      forth in the report.  I've already indicated the maximum

2      statutory sentence for each of the counts.  There are also

3      minimums involving Counts 2 through 5 of 15 years.

4              And with that, any objection to the court's

12:35:40  5      analysis of sentencing options as recited and adopted?

6                      MS. BRENNAN:  No, Your Honor.

7                      MR. WHITNEY:  No, Your Honor.

8                      THE COURT:  Okay.  So now we get to the point

9      where I get to hear the allocution, parties' arguments, and

12:35:57 10      I will ask Ms. Brennan if there's anything you wish to say

11      on behalf of the government relative to Mr. Mack's sentence

12      in this case as well as in the 2005 case?

13                      MS. BRENNAN:  Yes, Your Honor.  Thank you.

14              In fact, my arguments, I would ask the court to

12:36:13 15      apply them to both, the supervised release violation and the

16      court's sentence with respect to what it heard during the

17      trial of this matter.

18              Because what we know now is that Jeremy Mack is a

19      predator.  He looks at a young girl or a drug addict or even

12:36:29 20      his own children as opportunities.  They're not people.

21      They're not children who need a father.  They're

22      opportunities and they're dollar signs to him.  He sees a

23      young girl who's drug addicted and to him that is a gold

24      mine.  That is his ultimate opportunity to exploit, demean,

12:36:48 25      and abuse these girls.

                    Lori A. Callahan, RMR-CRR      (330) 252-6022

1       He was released from the Bureau of Prisons on

2   November 16, 2012.  And what did he do after serving 100

3   months of federal time?  He immediately re-offends, Your

4   Honor.  He gets that gift from his brother-in-law of cocaine

12:37:05  5   and he immediately starts selling.  Except this time he

6   decided to go bigger.  Drug trafficking apparently wasn't

7   enough for him.  So he decided he was also going to start

8   selling girls, but he used his drug trafficking to prey on

9   the most vulnerable that he encountered.  He preyed on these

12:37:27  10   girls, Your Honor.

11       We have photographs, the court saw them at trial,

12   Victim Number 1, Victim Number 2, Number 3 and Number 4.

13   What did these girls have to endure when they got naively

14   hooked up with him?  First, he fronts them dope.  He

12:37:48  15   pretends that he's kind to them and he's going to give it to

16   them for free.  And then he waits and he watches while they

17   get hooked.  Their habit increases.  Their need increases.

18       Three of these victims are heroin addicts, which

19   the court now knows is the worst kind of addict to be,

12:38:05  20   because it isn't a simple withdrawal process.  It is the

21   most painful and excruciating withdrawal process.  I think

22   Katie Frioud said best, "When you are withdrawing, it feels

23   like your insides are on fire, but you're covered with goose

24   bumps because you have the chills.  You can feel every one

12:38:25  25   of those goose bumps and they hurt."  The nausea, the

Lori A. Callahan, RMR-CRR        (330) 252-6022

1    shaking, the vomiting, the diarrhea.  He knew what it would

2    do to a heroin addict to get them fully hooked on free, I

3    put it in quotes, free drugs, and how desperate they would

4    be to maintain that habit.  And then he drops on them that

12:38:45  5    they had a debt.

6          Sometimes the debt was excruciatingly high, and he

7    told them that they had one way to pay off that debt to him.

8    He wasn't telling them to go get a job at McDonald's, 7-

9    Eleven.  He wasn't encouraging lawful employment.  No, he

12:39:05  10    encouraged the most exploitive form of income that he could.

11    He told them they had to go on Backpage.com and engage in

12    commercial sex acts.  Go to random hotels and have sex with

13    random men as a way that they would pay off their debt to

14    him.

12:39:21  15          And then he put a price on each one of their

16    heads.  If it was half an hour, it was $120.  If it was one

17    hour, it was more.  If it was something unusual, he set the

18    price.  They weren't doing this on their own.  He had

19    complete control over them.

12:39:40  20          He took all of the money that they received after

21    these acts, immediately.  They came in the door, they had to

22    hand it over to him.  He limited who they could talk to,

23    when they could leave the house.  Victim Number 1, she

24    wasn't allowed to just leave that house.  He made everybody

12:40:03  25    leave in a supervised way because he needed to hold on to

1       his money-making enterprise.  He monitored phone calls.  He

2       set the rules on how they had to appear, how they had to

3       act, how they had to behave.  He kept them under his control

4       and the way he did it -- actually, there was no limit to

12:40:25  5       what he was willing to do to make sure that these girls all

6       feared him and that he had complete control over every

7       aspect of their lives.

8            He withheld drugs from them when they were not

9       going on appointments, when they were not making enough

12:40:39  10      money for him.  He withheld heroin from desperate heroin

11      addicts.  He choked.  He strangled.  He hit.  He would say

12      to these girls, "I'm not afraid to kill a bitch.  Not afraid

13      to kill a bitch, chop her in pieces and throw her in the

14      river."

12:40:57  15           He paraded 8 Tattersal Court with guns.  He used

16      the guns to intimidate, threaten.  Victim Number 2 described

17      a night where he went running out of the house with his

18      firearm drawn.  He very cleverly kept them buried outside or

19      wherever he had them outside the house because he knew his

12:41:20  20      probation officer was coming and he didn't want his

21      probation officer to find the guns because he knew full well

22      that would be yet another federal offense for him.

23           He had a taser; he had a knife; he had a bullet

24      proof vest.  When he thought money came up missing, he did

12:41:39  25      cavity searches.  Even he admitted it on the phone and it

1    was an exhibit at trial.  What he did he say to his sister?

2    I think his words were, "Yeah, you know, I searched those

3    motherfuckers when I thought that there was money coming up

4    missing."  I mean, he just demeaned and abused.  There was

12:41:58  5    terror in that house.

6         With Victim Number 1, she tried to leave the house

7    to go to her mom.  She tried to leave.  She didn't have his

8    permission.  What did he do?  He punched her in the face and

9    split her lip.

12:42:12  10        Victim Number 4, what do we know, because the

11   court heard from Ashley?  He choked her out, choked her.

12        He was not afraid to be violent.  He was not

13   afraid to threaten to be violent.  He was not afraid to put

14   pressure, which is a word certainly used by Victim Number 4.

12:42:34  15   He was not afraid to coerce and intimidate to get what he

16   wanted, make sure his bottom line was constantly improving.

17        Some of his own witnesses came in here and

18   corroborated even what the victims were saying.  Aubry

19   Dillinger, Victim Number 4 made it very clear to the

12:42:51  20   defendant she did not want to go on Backpage.com.  He made

21   her go.  Monica Freedman talked about driving Victim Number

22   4 back to his house after an appointment while she cried

23   because she did not want to go back to him.  They all feared

24   him.

12:43:08  25        Victim Number 3 feared him so much so when she

1    finally had enough at that Camelot Motel, what did she do?

2    She desperately hopped into the car of somebody else's John

3    and fled away.  She ran away.  A few short days later, this

4    defendant was arrested.

12:43:26  5    We don't know what would have happened to her if

6    he had been on the streets for any amount of time longer,

7    but we knew what she feared would happen was he would come

8    and find her, which is why she fled the Camelot Motel.

9    We can't -- I don't even think I could ever

12:43:44  10    properly explain in any way the amount of damage that he has

11    done, and let's put a timeframe on it.  We're talking

12    November 16, 2012 when he's out, and April 9, 2013.  That is

13    a really short window of time to do this much damage and be

14    involved in this much criminal activity, but he did it.  He

12:44:05  15    set out to do it, because there wasn't a day that went by

16    after he was released that he wasn't exploiting someone in

17    some fashion or he wasn't engaged in criminal activity.

18    When he got out, he decided to go big evidently.

19    But the damage to these victims, Your Honor, the

12:44:26  20    increased drug dependence, the court got to see and hear

21    from Victim Number 2.  She described herself as having

22    social anxiety.  She described the very first night she went

23    to the defendant's house, how she is somebody who is

24    socially awkward.  And that is the prime target for a

12:44:47  25    predator like Jeremy Mack because he saw her.  He saw her

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    shyness; he saw her awkwardness.  He saw her interest in

2    cocaine and he pounced, and then he worked her and then he

3    sent her out to work for him.  She was 16, and he knew it.

4    She was the same age as one of his sons and younger than one

12:45:10  5    of his other sons.

6           Victim Number 1, as this court knows since the

7    verdicts in this case, the FBI had actually had to

8    investigate threats being made on-line against her by some

9    of his accomplices and some of his trial witnesses.

12:45:31  10           Victim Number 1, the court got to hear from, as

11    well, she has certainly come a long way, but the emotional

12    damage, the emotional scarring what she had to endure from

13    him, she still carries that around.  She is still sober; in

14    fact, yesterday, I believe roughly yesterday, we've hit nine

12:45:55  15    months.  So if she hasn't received it, she will be getting

16    another token.

17           And Victim Number 4, that impact statement is hard

18    to read, and it is consistent with what she has said to the

19    government and it is consistent with what she has said to

12:46:17  20    defense counsel.  When she wrote that victim impact

21    statement, a great deal of time had passed from the trial.

22    And she was alone by herself with a computer, and she got to

23    pour her heart out to this court in this victim impact

24    statement.

12:46:39  25           And what she describe?  She described essentially

 1    what the court had heard from these other victims, but even

 2    more, she described not being able to do anything without

 3    his permission, not being allowed to even have her own

 4    personal belongings anymore, how he demanded that even after

12:46:59    5    she do all these appointments, that he come home and have

 6    sex with her and how he ripped her and didn't care that she

 7    was bleeding or hurt, but made her go out and engage in

 8    additional sex acts so that he could make money.

 9            He played on her emotion and vulnerability.

12:47:16   10    There's no doubt about it.  She was vulnerable.  She was

11    exploited.  He kept promising her he wanted to get her an

12    apartment.

13            Your Honor, we have over 300 phone calls that we

14    listened to, his jail calls, that apartment was a key fact

12:47:32   15    for him for two reasons; he kept identifying her as his

16    number one defense witness, the one that was going to get

17    him off, because he was counting on her saying whatever he

18    wanted her to say; and two, because he wanted her to keep

19    working to make money for him.

12:47:51   20            But it's why, Your Honor, Carolyn Kucharski's

21    decision to get the defendant on the phone, on one phone and

22    then to use her personal cell phone to call Victim 4 and to

23    mesh those calls so they could hear from one another is such

24    an important moment in this case.  Here was a victim who

12:48:18   25    finally thought she got free.  When she tried to flee that

1    house, and, Your Honor, she did.  She references being

2    scared and trying to escape in her interview with the

3    defense.

4         She told us on one occasion, she packed all of her

12:48:31  5    belongings into a black garbage bag and pretended to be

6    taking out the garbage to try to leave that house.  Did she

7    come back?  Absolutely she came back.  There's no doubt.

8    She had no money.  She had an intense heroin habit.  And he

9    always promised her that things would change and he would

12:48:48  10   take care of her and he never did.  Because as soon as she

11   walked in that door, he would make her cry and he would put

12   her back up on Backpage.

13        The timing of things is pretty interesting, but

14   that call, Your Honor, what that said to her was she had

12:49:08  15   finally gotten free, and yet he was still able to get to

16   her, even though there's a no contact order.  There's now an

17   attorney who's going to make sure that he can still get to

18   her.

19        That is just essentially the nature and

12:49:28  20   circumstances of the drug trafficking and the sex

21   trafficking.  What we also know is that he obstructed,

22   tampering with witnesses and obstructing, telling people not

23   to talk to the FBI, trying to make sure Ashley Onysko

24   doesn't flip on him, make sure she has money, make sure you

12:49:43  25   reach out to her, make sure she doesn't flip.  He's afraid

1    of what they're going to say.  Why else would you tell

2    Victim Number 4 not to talk to the FBI unless you know she's

3    going to incriminate you?

12:49:59    4         With respect to his son, Toby Lewis, when he was

5    released in November of 2012, Toby was still 17 years old.

6    We know from Aubry Dillinger that in December of 2012, when

7    they're say staying at the hotel, before they moved into

8    Tattersal, that he and his son are selling guns, his minor

9    son.  And then he uses Toby Lewis to help him dispense the

12:50:21    10   drugs and sell the drugs and make sure that, you know, when

11   he allowed it, when these girls were actually able to get a

12   shot of heroin, and help with getting the girls back and

13   forth from appointments.

14        He was proud that Toby was involved in this

12:50:38    15   business, and then when he hears his son is going before the

16   grand jury, what does he do, the proud parent that he is?

17   He tells his son to lie to the grand jury.  He tells his son

18   to incriminate himself, at now the ripe old age of 18,

19   possibly look at his own federal time to try and save Dad.

12:50:57    20        Toby Lewis could have been indicted here.  He

21   wasn't.  He has this as an example, though.  The

22   exploitation of people did not end with the victims

23   identified in this indictment, didn't end with his own

24   children.  It included also all of the other people he sold

12:51:21    25   drugs to.

Lori A. Callahan, RMR-CRR      (330) 252-6022

1        The court got to see some people he brought in

2   here.  Every one of them knew him because he was a dealer.

3   Not one of them had a lawful relationship with him.  And if

4   you just compare their ages even, he's a then 38-year-old

12:51:43   5   man, now 39.  These kids, we're talking 20, 21.  These are

6   the people he decides to surround himself with.  Why?

7   Because he can exploit them, because he can prey on their

8   vulnerability and try to get rich off of them.

9        He is the very definition of a career offender,

12:52:02   10  Your Honor.  You just have to look at paragraphs 99 to 119.

11  That is a pretty long criminal history.  Every time he gets

12  out, he re-offends.  There has not yet been a single term of

13  incarceration or a single conviction that has deterred him.

14  In fact, his conduct is steadily escalating as we go.  He

12:52:25   15  cannot and will not be deterred.  He cannot and will not be

16  rehabilitated.

17        Your Honor, I would like to play for this court

18  three phone calls, and they're important for this reason.

19  They show that he cannot and will not be deterred, because

12:52:40   20  even after being arrested by the Elyria Police Department

21  and the drug task force out there in April -- we just pulled

22  here for the court two calls where he's talking about

23  continuing his operation while he's in jail.  And then I

24  will play for the court a later one, July 13.  After he's

12:53:01   25  been federally indicted for these offenses, he still talking

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    about how he's going to run his businesses from the inside.

2         Your Honor, I have marked here for the court, it's

3    Government's Exhibit 1, it's marked sentencing, a copy has

4    been provided to defense counsel.  I also provided defense

12:53:23   5    counsel last week with a list of the excerpts I'm going to

6    play.  I'm not going to play the full calls.  Like I said,

7    I'm not -- each call is approximately 15 minutes.  I'm not

8    going to play the full portion.

9         The first call is an April 18 call between the

12:53:40  10    defendant and his son, Toby Lewis.  You'll hear that there's

11    conversation about the apartment, as well as additional

12    conversation, and if the court would allow me to sit to do

13    this.

14         THE COURT:  You may.

12:53:51  15         MS. BRENNAN:  Thank you.

16         Your Honor, just for the record, that's time

17    stamped 158 to 237.

18         THE COURT:  Thank you.  I am moving now to five

19    minutes and 55 seconds.

12:56:58  20         (Phone call played.)

21         MS. BRENNAN:  Your Honor, that call ended or that

22    excerpt ended at 7 minutes and 30 seconds.

23         It's important to note that during that mesh call

24    that Ms. Kucharski orchestrated or participated in, that one

12:57:10  25    of the things the defendant said to Victim Number 4 was that

Lori A. Callahan, RMR-CRR          (330) 252-6022

1    he was still interested in getting her that apartment.

2         Forgive me, Your Honor.  This call, the next call

3    is going to be April 23, 2013 at 10:17 p.m.

4         Your Honor, Jesus is the caller, because that is

12:57:44  5    an inmate that the defendant was with at CCA.  He used that

6    individual's pin number to make that call.  We will hear the

7    defendant's voice on here.  He's identified -- I would say

8    that the court has already with respect to briefing seen a

9    letter written to who he identified as Toby Clifton when he

12:58:03  10    was trying to avoid the no contact order and the return name

11    on that, because he didn't want to put his own return name

12    on Jesus again.

13         (Phone call played.)

14         MS. BRENNAN:  Your Honor, I think the court might

12:58:46  15    recall from Government's Exhibit 30, the Backpage ads,

16    Luscious is the name that Ashley Onysko used, or Luscious

17    Love, but this is Ashley Onysko.

18         (Phone call played.)

19         MS. BRENNAN:  Your Honor, that is the beginning of

12:59:45  20    that call up through 1 minute and 26 seconds.

21         I will now fast forward to 8 minutes and 26

22    seconds.

23         (Phone call played.)

24         MS. BRENNAN:  Your Honor, that time stamp ending

13:03:05  25    on that one is 11 minutes and 26 seconds.  I just -- for the

1    record, in case it couldn't be heard, he was saying that

2    "Wait until Toby gets that ho up underneath his wings."

3            Now I'm going to play the last of the calls that

4    we've selected out of the 300 or so that we have.  This is a

13:03:25  5    call that's made while he's under federal indictment to his

6    brother Johnny.  I'm going to go and fast forward to 7

7    minutes and 50 seconds.

8            (Tape played.)

9            MS. BRENNAN:  Your Honor, I stopped that call at

13:06:18  10    10 minutes and 15 seconds.

11            THE COURT:  Was that started at the beginning?

12            MS. BRENNAN:  I'm sorry, no, it was not, Your

13    Honor.  It started at 7 minutes and 50 seconds.  I played a

14    little portion of the beginning so you can hear the

13:06:28  15    defendant identify himself, and I am sorry, it sounds like

16    my computer is about to take off, a very strange whirring.

17            THE COURT:  What was the date of that?

18            MS. BRENNAN:  That one was July 13, 2013,

19    approximately 2:25 p.m.

13:06:45  20            THE COURT:  If you could start with the first

21    call, which I believe you said was April 18?

22            MS. BRENNAN:  Yes, Your Honor.

23            THE COURT:  And you played two excerpts from that

24    call?

13:06:57  25            MS. BRENNAN:  I did, Your Honor.  That was a phone

Lori A. Callahan, RMR-CRR        (330) 252-6022

1    call with the defendant and Toby Lewis, the portions I

2    played were the conversation between him and his son, Toby

3    Lewis, April 18, 2013, at approximately 11:33 p.m.

4           Would you like me to identify the time stamp

13:07:14  5    again, Your Honor?

6           THE COURT:  1:58 to 2:37?

7           MS. BRENNAN:  Yes.

8           THE COURT:  And the second excerpt was 5:55 to

9    7:30?

13:07:24 10           MS. BRENNAN:  And the next phone call, Your Honor,

11    was --

12           THE COURT:  April 23?

13           MS. BRENNAN:  Yes.  Did you want me to go through

14    them all?

13:07:31 15           THE COURT:  Yes, please.

16           MS. BRENNAN:  April 23, approximately 10:17 p.m.,

17    between the defendant and Ashley Onysko, who identified

18    herself by her nickname, Luscious.  That was at the

19    beginning of the call up through 1 minute and 26 seconds,

13:07:45 20    and it began the next excerpt because there were only two.

21    The next one was 8:26 to 11:30.

22           And just, again, for the record, the final one was

23    July 13, 2013, approximately 2:25 p.m. between the

24    defendant, and we believe the person speaking was his other

13:08:05 25    brother, Johnny.  He's got more than one.  That one we

Lori A. Callahan, RMR-CRR     (330) 252-6022

1    played the very beginning so the court could hear him

2    identify as the caller, but the excerpt was 7 minutes and 50

3    seconds to 10 minutes and 12 seconds.

4           THE COURT:  Thank you.

13:08:22    5           MS. BRENNAN:  And what those calls show the court

6    is that he's never going to stop.  A hundred months didn't

7    stop him, not even for a day or two once he was released and

8    being incarcerated on these charges, he's still not

9    interested in ceasing any of his criminal conduct.  He

13:08:41   10    scored a 48.  Just take the Count 2 for -- I'm sorry, Count

11    3 for Victim Number 2 alone, that was a 44.  He quite

12    literally has taken himself off the charts.

13           That 48 accurately reflects each and every crime

14    he committed in this case, the 48 does.  The guidelines

13:09:07   15    don't go that high, but the 48 accurately accounts for every

16    single one of his crimes.  The speed with which he did it

17    because he certainly didn't waste any time, the amount of

18    criminal activity in just a four-month window of time, and

19    the fact that he is willing to do this even while he's

13:09:25   20    incarcerated and the only thing that seems to be causing him

21    a little bit of delay in the plan is that he has to first

22    get past his criminal trial.

23           The guidelines end at 43, so that's where he is,

24    Your Honor.  He has earned that spot at a 43, Criminal

13:09:45   25    History Category VI.  There is no range there, Your Honor.

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    It is life.  And he has earned that time.  That is the term

2    that will adequately reflect the depravity that he showed in

3    that very short period of time, the violence, his criminal

4    history, the damage he has done to the victims.  It's also

13:10:09  5    the only thing that will adequately protect society, because

6    here's what we know both by looking at the PSR, seeing his

7    conduct here, the supervised release violations so quickly

8    following his release from the BOP, the indictment time

9    period, and the phone calls we just played, when he is

13:10:30  10   released, he will re-offend.  This is what the life-style he

11   has chosen.  He proudly considers himself a criminal.

12       A life term will hold him accountable for all that

13   he has done, all that he has allowed himself to be, and it's

14   blatant disregard he has shown for any criminal law or even

13:10:58  15   just the simple fact of pretrial detention, it is not

16   greater than necessary, Your Honor, not in this case, not

17   for this defendant.

18       THE COURT:  All right.  Thank you, Ms. Brennan.

19       All right.  Mr. Whitney, we have been going now

13:11:39  20   for over two hours.  I will ask you if you need a break

21   before you proceed or if you would like to proceed.

22       MR. WHITNEY:  I don't need a break.  I don't know

23   if anybody else does.

24       THE COURT:  Very well.  I will permit you to

13:11:52  25   address the court relative to your client's sentence in this

Lori A. Callahan, RMR-CRR       (330) 252-6022

1      case.

2                  MR. WHITNEY:   Thank you, Judge.

3                  Judge, I, too, would indicate that my remarks

4      would attach both to the supervised release violation and to

13:12:08   5      the substantive counts he was convicted of.

6                  The government seems to make a lot out of the fact

7      that he got out of jail and got out of prison and went right

8      back to criminal activity.  That's true.  And it's because

9      that's all he knew was criminal activity.

13:12:32  10                  If you look at his background, Your Honor, I think

11      it is relevant.  I mean, the law makes it relevant and I

12      know you make it relevant, that his whole family has been in

13      prison.  His brothers, his sons are all headed that way, his

14      parents.  He was raised in such a -- with a dynamic of

13:12:56  15      criminal activity that that's all he knew when he got out of

16      the penitentiary.  He bounced around from group home from

17      group home as a child.  I think he spent seven or eight

18      years away from his home before he was of age.  He's got, as

19      you can see, a criminal history as a juvenile.

13:13:20  20                  And maybe it's just as I get older, I start

21      thinking there, but for the grace of God why?  I say to

22      myself in these cases all the time, why is it that Larry

23      Whitney doesn't go get some heroin?  I have the ups and

24      downs more than most people do, I would say in my week.  I

13:13:38  25      mean, I've had some real down days.  And why is it that

1    Larry Whitney doesn't go get some heroin like we've seen

2    here in these 45 hours of trial?

3          Is it because I was -- not because I'm not

4    depressed, because I was raised by loving people, people

13:13:56  5    that loved me, and people that wanted to see that I knew

6    what education was, and that I knew what was right and what

7    was wrong and how to earn a living and how to not earn a

8    living.  That's why I don't do that and why other people do

9    that.

13:14:14  10          And I think that's so important, and I would ask

11    the court to consider the fact the way he was raised.  He

12    was raised by people that said the way to earn money is to

13    pimp or to sell drugs or to steal rather than "Go get

14    educated, Larry.  Go get an education.  Take your brothers

13:14:35  15    with you and get educated.  If you do something wrong,

16    you're going to get it from me.  Rather than great job,"

17    that kind of thing.

18          And maybe it's just -- I guess the older I get the

19    more I see this, and I just wonder and I think that's the

13:14:57  20    formula.  And I think that is a formula that we don't see in

21    this family dynamic that he was raised in.  So why did he do

22    that?  He did it because that's all he knew.

23          Now, punish him, I think, for what he did.  I

24    think he would be satisfied if he were to be punished for

13:15:17  25    what he did.  If we look at these victims that come into

1    this case, none of these victims -- it's as if the

2    government says that he created this addiction for these

3    people, that he created this atmosphere.

4           They came to him, Judge, and brought with them

13:15:37  5    their addiction.  They brought with them all these problems.

6    He didn't create these problems.

7           Victim Number 1 said she was 14 or 15 years old

8    she had been addicted to drugs.  I think at the time of the

9    trial, as she's almost nine months, she was five months

13:15:57  10   clean and sober.  That's really the first time that has

11   occurred, that is done, that happened to her.  She also said

12   that she had a debt, knew about the debt that she had to him

13   and stayed and came back and knew what she was getting into.

14          She was there five weeks, five or six weeks,

13:16:23  15   however you count it.  Let's say it's six weeks.  Six weeks

16   of this woman's life she was with him.  Is it fair now to

17   blame, to bring on his shoulders all of the misery that this

18   addiction has created for her and her family to rest it on

19   his shoulders because she was with him for five or six

13:16:43  20   weeks, however long it was, when she brought the addiction

21   to him?  I just don't think that's fair.

22          Victim Number 2, she was there about three or four

23   weeks.  She told me in my cross-examination, "If you can

24   think of the drug, I used it since I was 13."  She brought

13:17:09  25   that with her to him.  She found him buying drugs.

Lori A. Callahan, RMR-CRR        (330) 252-6022

1           Number 3, this started at least a year and a half

2      before the drug addiction before she met the defendant.

3      That she made many attempts to get clean.  She met him

4      trying to buy drugs.  She bought drugs from him.  And she,

13:17:41  5      again, agreed to the terms of this agreement that they had

6      among each other.  "I was eager to do it so that I could get

7      drugs."  That's what she told me.  "I wanted drugs and I

8      didn't care what I was doing to get the drugs.  I left,

9      sure."  She ran away from him, but he never chased her down.

13:18:07  10          He never -- she said she actually had some contact

11      with him after she left about something.  So I think when

12      you look realistically at what occurred here, a realistic

13      look at the facts and circumstances and evidence of this

14      case, I think you will find that these people, all four of

13:18:30  15      these people named in the indictment -- the fourth one I

16      will talk about in a moment.  She was there the longest.

17      She was there about three and a half months of her life and

18      had a drug habit, a serious drug habit for almost -- since

19      she was like 16, some four years -- four years before she

13:18:51  20      even met Jeremy Mack.  Again, she met him buying drugs,

21      going to buy drugs to support a habit.

22           So to say then that he is to shoulder the burden,

23      shoulder the evil that this heroin creates in a family, in a

24      community for his five weeks with Number 1, three weeks with

13:19:17  25      Number 2, ten days or two weeks with Number 3 and three and

1    a half months with Number 4 is just not fair.

2         He talks -- and it's true, he talks about this

3    escort service that you heard on the audio here a few

4    moments ago.  He thought that was a legitimate -- he's not

13:19:43  5    talking about being a pimp.  He's talking about an escort

6    service.  He's talking about a legitimate business that he

7    thought, and I think the computer dumps that they had

8    indicate that he looked -- the computers were used to

9    generate research about this kind of a business.  And he

13:20:02  10   thought that he could run a legitimate escort business.

11        And these talks, and most of the conversation you

12   heard here on the -- was before he was even federally

13   indicted.  This was conversation that he had before the

14   federal indictment came down.

13:20:21  15        I think the true story here is that during the

16   time that these girls were with him, he provided drugs for

17   them.  They stayed there.  They used the drugs, that he --

18   and will take -- we will take Victim Number 4 and talk about

19   her for just a couple of minutes.

13:20:52  20        It's not fair to characterize, I don't think we

21   both heard -- the government heard an interview that I

22   conducted of her on December 11 of 2013.  That was taped.

23   The government heard that a couple hours ago.

24        It's not fair to characterize, I don't think, that

13:21:08  25   interview as being consistent with the information that the

Lori A. Callahan, RMR-CRR       (330) 252-6022

1    government had.  It's just not fair to say that.  When she

2    tells me that "He never forced me to do this, that it was my

3    choice.  That if I were to ask you if he forced you to do

4    this, what would you say?  No, that was my choice.  Did he

13:21:30    5    hold drugs over your head?  No.  Could you come and go?

6    Yes.  Did he -- was he supportive of you in contact with

7    your family?  Yes."

8        It's not -- I'm not getting at -- I'm not trying

9    to get at here and invade the province of this jury in

13:21:51    10    determining that he was guilty of that conduct with Number

11    4.  What I am trying to tell the court is that how can you

12    put any credence in this, in this victim impact statement

13    from a witness who I think at the same time she's talking

14    with me, telling me she's not forced, she's talking with the

13:22:16    15    government, saying she is forced.  You can say whatever you

16    want about the distance from the time and so forth, and I

17    don't know -- we don't know what's changed in her life in

18    the last couple of weeks before she filed this victim impact

19    statement.

13:22:31    20        But I think it's substantial for the court to look

21    at -- I just don't think you can put any credence in what

22    she says.  I think she told me what I wanted to hear and she

23    told the government what they wanted to hear.  Now I think

24    she's telling the court what she thinks you want to hear.

13:22:48    25        And I don't know -- this trial table shares

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    probably over 100 years of trial experience, and none of us

2    put her on for whatever reason that was.  I know the reason

3    I didn't put her on.  One of the reasons was because I

4    didn't know what she was going to say.  I didn't have faith

13:23:05  5    on what she told me or what she told the government.

6         So how can we now put her up to you saying,

7    "Judge, you should take this into account in determining

8    this sentence," and I don't think we can do that.  I think

9    if we do do that, I think we arrive at perhaps a sentence

13:23:23 10    that is skewed for some reason based upon I think what the

11    true facts of this case are.

12         So I guess what we're asking the court, and I am

13    just here to make one point, and I am going on a limb to do

14    this, but I think these kinds of cases I think require

13:23:42 15    lawyers to go out on a limb.  I am just asking the court to

16    look at what is fair and just in the whole picture here, not

17    just in this couple of months, a couple, three and a half

18    months, longest time anybody has been with him, to look at

19    what they brought to the equation, they meaning Victims 1,

13:24:04 20    2, 3 and 4.  Look at what they brought to this group.

21         And look at I think -- I don't think the picture

22    painted by the government is supported by the evidence in at

23    least some ways.  I don't remember the threats and I don't

24    remember the repeated cavity searches that they're talking

13:24:26 25    about here.  I don't remember that being offered in evidence

Lori A. Callahan, RMR-CRR     (330) 252-6022

1    here.  I remember there may be a discussion about one time.

2    That doesn't mean it happened 50 times.  I remember evidence

3    of people coming and going.  I remember evidence of not

4    having the course of nature contact over these people that

13:24:48  5    the government contends to -- the government indicates is

6    evidenced here.

7         So what we're asking the court to do is sentence

8    him for what he did.  Sentence him for what we think the

9    total picture, all of the evidence in context indicates, and

13:25:07  10    to consider not only that, but to consider as this court is

11    required to do, consider the history and background of this

12    defendant, consider the upbringing that he had, things that

13    aren't his fault.  I mean, he didn't create that atmosphere

14    in his home.  It was created for him.  And I think we all

13:25:31  15    are creatures of what we learn in the first few years of our

16    lives and I think we all -- those of us that do this kind of

17    business, I think, appreciate that more than other people.

18         And there's no question that heroin and drug

19    addiction and prostitution are horrible things in our

13:25:51  20    society.  But does he deserve to be -- to stand as the

21    poster child for all of this and all of the injury that the

22    families of these four people have undergone for what he did

23    and for the contact he had with these people for this

24    limited amount of time?

13:26:11  25         Thank you.

Lori A. Callahan, RMR-CRR      (330) 252-6022

1          THE COURT:  All right.  Typically, in these types

2     of sentencing, I give the attorneys two opportunities.  So I

3     will ask the government if there's anything further you

4     would like to add to your argument, statement to the court

13:26:56   5     relative to sentence and, Mr. Whitney, then I will give you

6     an opportunity, another opportunity, and then I will hear

7     from Mr. Mack himself, should Mr. Mack wish to address the

8     court.

9          MS. BRENNAN:  No, Your Honor.  Thank you, Your

13:27:12  10     Honor.

11          MS. SKUTNIK:  Thank you, Your Honor.  Your Honor,

12     just briefly.  I want to point out that the government's

13     position in this case which I think was articulated very

14     well by Ms. Brennan is the fact that what makes Mr. Mack so

13:27:28  15     incredibly dangerous is his ability to, one, pick people

16     that he can exploit, and more importantly, two, his ability

17     to control other individuals.

18          And so respectfully to Mr. Whitney, the government

19     doesn't assert that in this case Mr. Mack got any of these

13:27:48  20     individuals addicted to heroin; in fact, the evidence is

21     quite to the contrary.  For example, just by way of

22     reminder, Victim Number 1 spoke of the fact that she was in

23     a horrible car accident, was over-prescribed pain medication

24     by a physician, became addicted to said pain medication, and

13:28:08  25     then ultimately that developed into a heroin addiction when

Lori A. Callahan, RMR-CRR      (330) 252-6022

1        she could no longer afford the Oxycotton that had been

2        prescribed by a licensed medical professional.  So we're not

3        saying that by no means.

4               But certainly when they walk through that door to

13:28:24   5   buy drugs, there's nobody in this room who's better able to

6        assess the vulnerabilities of people than Mr. Mack himself.

7        Even with all of our trial experience as we sit here at this

8        table and the court's experience, there's nobody better at

9        picking out the weak, the weak link, or the weakest duck,

13:28:47  10   and then using a pattern of manipulation that is far more

11       compelling and far more effective in the end than any sort

12       of actual physical violence, although, there was physical

13       violence and physical threats, and so that's what we're

14       saying about the dangerousness of Mr. Mack, his ability to

13:29:09  15   control.  If there was one word to sum up this case, it

16       would be the word "control," and that's what he was able to

17       do.

18               And if you ask an individual, if you ask any one

19       of these victims today to describe what is the legal

13:29:23  20   definition in federal court of force, nobody would be able

21       to give the definition that was so well put forth in front

22       of the jury and explained to them, because they have their

23       own conception of what force means.

24               So we have to look to what the defendant did in

13:29:42  25   order to control them, to coerce them, the manner in which

Lori A. Callahan, RMR-CRR        (330) 252-6022

1     legally they were forced and placed in a position where they

2     had no other choice but to do the terrible things that they

3     had to do in those hotel rooms hour after hour after hour,

4     sometimes as many as 13 to 14 times a day so that they could

13:30:02    5     beg for that shot or that point of heroin.

6             And that segues, Your Honor, into Victim Number 4.

7     Because of all of the individuals involved in this case, I

8     suspect there was nobody sicker than Victim Number 4, and

9     the relationship between Mr. Mack and Victim Number 4 was

13:30:19  10     that of almost a domestic violence victim, that type of

11     cycle.  And you could see it in the testimony of the

12     individuals as they described that relationship from as

13     early as they met in that hotel room situation up and

14     through all of the time that was accounted for at Tattersal.

13:30:38  15     And that push/pull and how he worked her more than any other

16     person in that household.

17             Your Honor, Mr. Whitney speaks of issues regarding

18     her credibility.  And absolutely, absolutely, she has given

19     conflicting statements as it related to the activity that

13:30:58  20     occurred in that home, and isn't sure and doesn't

21     characterize to Mr. Whitney that he forced her to do certain

22     things.  But what we do know is that she said she was

23     pressured by the defendant to do certain things.  What we do

24     know is that she didn't get heroin unless she did certain

13:31:21  25     things.

1          What we do know is that she said to Mr. Whitney

2     and to the government that he would forcibly have sex with

3     her to the point that he physically damaged her and created

4     or caused her vagina to bleed and then would force her to go

13:31:38  5     on appointments with clients because he wanted the money

6     that she would make.

7          What we do know is that in an interview with the

8     government, on June 27, 2013, she outlined and explained the

9     lifestyle and the activity of the defendant that is

13:31:51  10     consistent with the victim impact statement that she gave to

11     this court.  What we do know is in the interview with

12     Mr. Whitney, she indicated a number of occasions where

13     violence took place in that household.  She indicated a

14     number of occasions when she attempted to leave that

13:32:07  15     household.  She indicated that the defendant strangled her,

16     threatened to cut her up.  These are all things that are

17     consistent with the environment in the Tattersal house that

18     was described in the trial testimony which the court should

19     rely upon.

13:32:25  20          So, Your Honor, whether or not the court places

21     any weight, some weight or significant weight to Victim

22     Number 4's statement, the fact of the matter is, she is able

23     to put into words today, and I don't know if she's clean or

24     sober today, I really don't, because it varies from day to

13:32:50  25     day.  She's has a horrific addiction to heroin and has not

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    found recovery yet, but what we know is that she was able to

2    really well articulate in that statement just what life was

3    like in that household, just the amount of level of control

4    the defendant had on anybody who walked into that house.

13:33:15    5        Think about it, Your Honor.  Think about those

6    kids that he insisted be called to the stand in his defense,

7    how he managed to marshal them to come here to try to defend

8    what was going on in the house and to give the script that

9    everybody was happy and everything was great in that house,

13:33:40   10    when we know all evidence really to the contrary and under

11    pretty heavy cross-examination, evidence to the contrary.

12        There's few people -- I mean, think about the

13    situation respectfully that occurred that caused the removal

14    of prior counsel.  Think about the amount of manipulation

13:34:02   15    and control that occurred while this case was pending by

16    Mr. Mack, in order to be able to circumvent, in order to be

17    able to ultimately have what he wanted, which was contact

18    with that one woman that he thought he had the most control

19    over.  It's not just heroin addicts that he had the ability

13:34:25   20    to control or affect.  He's a quite powerful man when it

21    comes to finding people's weaknesses and manipulating them.

22        And so to come back to the original statements

23    made by my cocounsel so eloquently in her first remarks,

24    that's what makes him so dangerous.  And respectfully, if

13:34:45   25    that is all he knows, then that means it's all he will ever

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    know and he will never change.  But to blame him -- or to

2    blame the family for what he's become, frankly, he's one of

3    the eldest in the line of siblings.  I think it's better to

4    show that they followed in his footsteps just as he

13:35:05  5    attempted to mentor his own children to engage in criminal

6    activity.  How he has not only claimed that he, you know,

7    became this person, this monster because of his childhood,

8    but he tried to pass that on to his own very children.

9         And if you close with a visual, think about the

13:35:22  10   pictures that were admitted during the course of this trial,

11   with his sons, sitting in that house on Tattersal,

12   surrounded by heroin addicts that had to go around in their

13   underwear, in essence, right, high, vomiting, sick, stoned

14   and there they are with all the money spread out in front of

13:35:44  15   them, the proceeds of the illegal activity of their father,

16   their mentor.  He's a one-man crime wave that he wants to

17   continue.  He wants to continue to affect others to create

18   further ripple effects of what he's capable of.

19        So, yeah, he's not the guy that walks up to

13:36:07  20   somebody with a gun.  He's not the person that pulled the

21   trigger.  He did worse.  He brought all forms of control to

22   bear, to harm these people.

23        And the last visual I will leave with you, Your

24   Honor, is that picture of Victim Number 1.  There were lots

13:36:23  25   of pictures that came in in this case.  Remember what she

         1    looked like when she first went to Tattersal?  She's a

         2    beautiful young lady, not much different than what she

         3    appeared -- how she appeared in this courtroom.  Then think

         4    about that picture of her on the bed five to six weeks

13:36:41 5    later.  There are people starving in Africa that looked

         6    better than she looked.  She was so emaciated.  That's the

         7    amount of damage that he was able to do in five to six

         8    weeks.  Multiply that by all these girls, Your Honor.  Thank

         9    you.

13:37:03 10                 THE COURT:  Thank you, Ms. Skutnik.

         11                 Mr. Whitney or Mr. Ray?

         12                 MR. WHITNEY:  Nothing further, Your Honor.

         13                 THE COURT:  All right.  Mr. Mack, I will offer you

         14   an opportunity to speak, but before I do, again, now, we've

13:37:19 15   gone for an excess of two and a half hours, and if you need

         16   to take a break before you address the court, if you would

         17   like to address the court, you may request a break.

         18                 THE DEFENDANT:  I have nothing to say, Your Honor.

         19                 THE COURT:  You have nothing to say.  Let me

13:37:33 20   indicate to you that this is your sentencing hearing, and

         21   you are permitted to address the court in mitigation of your

         22   sentence in this case, and if you wish to address the court,

         23   this is your opportunity to do so.  I want to make sure you

         24   know you have this opportunity.

13:37:48 25                 THE DEFENDANT:  Yeah, I understand.

                      Lori A. Callahan, RMR-CRR      (330) 252-6022

1          THE COURT:  Okay.  And you do not wish to address

2     the court?

3          THE DEFENDANT:  I do not.

4          THE COURT:  Okay.  First of all, the court wishes

13:38:55  5     to indicate that as always in sentencing, pursuant to Title

6     18, United States Code, Section 3553(a), the court is

7     required to impose a sentence sufficient, but not greater

8     than necessary, to comply with the purposes of sentencing

9     set forth in the sentencing statute.

13:39:19 10          In determining a sentence, the court is required

11     to consider the applicable factors enumerated in Section

12     3553(a), which the court finds to be as follows:

13          First of all, with respect to the nature and

14     circumstances of the offenses, there was a trial in this

13:39:56 15     case, and so based upon the testimony itself, the court is

16     obviously well aware of what the nature and circumstances of

17     the offenses were.  I will just very briefly summarize them

18     for purposes of the court's analysis.

19          From on or about December 12 -- I'm sorry, on or

13:40:34 20     about December 2012 and continuing to on or about April 9,

21     2013, in the Northern District of Ohio, Mr. Mack, his

22     codefendant, Ashley Onysko, and others, did knowingly and

23     voluntarily conspire, combine, confederate and agree with

24     each other to knowingly recruit and entice, harbor,

13:41:05 25     transport, provide, obtain and maintain by many means, in or

Lori A. Callahan, RMR-CRR     (330) 252-6022

1    affecting interstate commerce, persons, knowing and in

2    reckless disregard of the fact that means of force, threats

3    of force, fraud, coercion and any combination of such means

4    would be used to cause persons to engage in a criminal sex

13:41:28  5    act, and to knowingly recruit, entice, harbor, transport,

6    provide, obtain and maintain by any means, in or affecting

7    interstate and foreign commerce, a person, knowing and in

8    reckless disregard of the fact that the person had not

9    attained the age of 18 years and the person would be caused

13:41:49 10    to engage in a commercial sex act, in violation of Title 18,

11    United States Code, Section, 1591(a)(1), (b)(1) and (b)(2)

12    and knowingly and intentionally distributed, dispensed and

13    possessed with intent to distribute and dispense a mixture

14    and substance containing a detectable amount of heroin, a

13:42:14 15    Schedule I controlled substance and a mixture or substance

16    containing a detectable amount of cocaine, a Schedule II

17    controlled substance.

18            It was part of the conspiracy that Jeremy A. Mack

19    and his codefendant, Ashley M. Onysko, distributed a mixture

13:42:36 20    or substance containing detectable amount of heroin, a

21    Schedule I controlled substance and distributed a mixture or

22    substance containing a detectable amount of cocaine, a

23    Schedule II controlled substance to others who paid for the

24    drugs upon receipt and also to Victims 1, 2, 3 and 4 who

13:43:00 25    were not required to make simultaneous payments for the

1   drugs.

2          It was further part of the conspiracy that after

3   Victims 1, 2, 3 and 4 incurred drug debts, Jeremy Mack told

4   and caused others to tell Victims 1, 2, 3 and 4 that they

13:43:19  5   must engage in commercial sex acts and then provide all of

6   their earnings to Mr. Mack and Ms. Onysko to repay their

7   drug debts.  And really, it was Mr. Mack who received the

8   monies and determined how the monies would be distributed

9   and applied.

13:43:47  10          It was further part of the conspiracy that

11   Mr. Mack and Ms. Onysko posted escort advertisements, which

12   included photographs of Victims 1, 2, 3 and 4 on an

13   commercial website, in this case, it was Backpage.com, an

14   interstate commercial website.

13:44:12  15          It was further part of the conspiracy that Jeremy

16   A. Mack and Ms. Onysko used and caused to be used force,

17   threats of force, fraud and coercion to compel Victims 1, 2,

18   3 and 4 to engage in commercial sex acts.

19          And as it pertains to these particular offenses

13:45:03  20   that the court summarized, that's Counts 1 through 7.  A

21   very detailed count is set forth in the presentence report,

22   and again, of course there was a trial in this case.  So the

23   court is not going to reiterate all the information

24   contained in the presentence report, but, again, will adopt

13:45:29  25   it, since there are no objections to the descriptions of the

1      offenses, nature and circumstances of the offenses.

2              Also, in addition to the conspiracy to commit sex

3      trafficking and drug trafficking, as well as the substantive

4      offenses of sex trafficking, and also the substantive

13:45:49   5   offenses of distribution of the drugs, heroin and cocaine,

6      there were two other offenses involved in this case and for

7      which the jury found Mr. Mack guilty and those were, of

8      course, the obstruction counts set forth in paragraphs -- in

9      Counts 8 and 9.  And those are also touched upon in the

13:46:25  10   presentence report, particularly in paragraphs 51 and 52,

11     and the court will not further elaborate or summarize those

12     offenses but, again, since -- but, again, just adopt the

13     summaries as set forth in the report.

14             So with that, Counsel, I ask you if there are any

13:46:55  15   objections as to the nature and circumstances of the offense

16     as summarized and referenced by the court?

17             MS. BRENNAN:  No, Your Honor.  Thank you.

18             MR. WHITNEY:  No, Your Honor.

19             THE COURT:  So next is the history and

13:47:08  20   characteristics of the defendant and, of course, Mr. Whitney

21     had indicated that the court ought to take that into

22     consideration and that, in fact, is one of the factors that

23     the court must take into consideration in sentencing.

24             So, of course, the court has reviewed the

13:47:47  25   background information contained in the presentence report.

                Lori A. Callahan, RMR-CRR      (330) 252-6022

1      Mr. Mack is 38 years old, and as reflected in the report, it

2      does appear that he has -- that he was reared in a very

3      troubled and dysfunctional family environment.  He is one of

4      four children, and his parents purportedly suffered from

13:48:26   5      alcohol and substance abuse issues during Mr. Mack's

6      formative years.  He doesn't have a significant -- any

7      significant medical issues.  He does have a substance abuse

8      history, which consists of marijuana and cocaine abuse

9      commencing from the time when he was 11 years old.  At 11,

13:49:06  10      he started experimenting marijuana and later also used

11      cocaine.

12                  Mr. Mack has never married but has fathered three

13      children.  At least one of his children, Toby Lewis, was

14      involved in the offense, and the court found him to be a

13:49:34  15      participant in the offenses.

16                  Mr. Mack has earned his GED and also completed

17      some occasional training while incarcerated previously.  He

18      has no verifiable employment history.  His criminal history

19      dates back to the age of eight.  He has a number of felony

13:50:11  20      convictions related to drugs, firearms, escape and other

21      offenses again set forth in detail in the report, and as the

22      court previously found, he meets the criteria of being a

23      career offender.

24                  So with that, any disagreement as to the history

13:50:36  25      and characteristics of the defendant as summarized and

1    recited by the court?

2              MS. BRENNAN:  No, Your Honor.

3              MR. WHITNEY:  No, Your Honor.  Thank you.

4              THE COURT:  So now the court has to determine the

13:50:51  5    sentence and the need for the sentence imposed in this case,

6    in both of these cases.

7              First, I want to make a brief comment relative to

8    the victim impact statements the court received.  The court

9    received those relative to two victims.  The victim impact

13:51:25 10    statements were not considered when the court calculated the

11    guideline sentence.  The guideline sentence was based upon

12    the offenses in this case and the guideline criteria that

13    applied to the offenses and any increases relative to, for

14    instance, obstruction or the role -- that aggravated role

13:51:58 15    that Mr. Mack played in organizing his organization and

16    those who participated in his organization.

17              So victims do have a right to speak and be heard.

18    That's both by statute and by rule.  But the guideline

19    sentence is a separate calculation.  And relative to Victim

13:52:42 20    Number 4, which I think some of the discussion centered upon

21    her statement, the court did hear from other individuals,

22    the witnesses in this case who described the conditions at

23    the Tattersal house where the victims lived with Mr. Mack,

24    and so her experience isn't limited to how she viewed it,

13:53:27 25    but others corroborate things that she said in her letter.

1    And so I don't know that the debate is so much

2  regarding the types of things that happened to Victim 4, but

3  rather relative to perhaps degree.  I'm not sure what the

4  debate is, because even the other witnesses testified to

13:54:03  5  some of the things that Victim 4 sets forth in her

6  statement.

7    Setting that all aside, the court is going to look

8  at all of the factors because it is the totality of the

9  factors that the court must consider in this case.  And the

13:54:23 10  court has the benefit in this case of having heard the

11  testimony of witnesses who actually saw and observed the

12  conditions experienced by the victims when they were working

13  for Mr. Mack and his operation, so I just want to make that

14  point.

13:54:57 15    So by his conduct, looking at the entire picture,

16  Mr. Mack has repeatedly shown an utter disregard and

17  contempt for the laws and institutions of our society.  He

18  has shown a disregard for the safety and for the well being

19  of others as demonstrated in his treatment, and I believe

13:55:44 20  the government termed "exploitation" of the victims in this

21  case.

22    At the relatively young age of 38, Mr. Mack has

23  amassed an extensive criminal record that includes violent

24  offenses.  As I mentioned, his first of nine juvenile

13:56:15 25  adjudications occurred when he was eight years old.  His

1    first adult conviction occurred when he was 18.  He scores

2    as a Criminal History Category VI, without even considering

3    the two-level increase that the court applied because he was

4    on supervised release for his 2005 federal drug conspiracy

13:56:41  5    case.

6         He also qualifies separately as a career offender.

7    And his past convictions include, as I said before, several

8    drug trafficking offenses, drug possession, weapons

9    possession offenses, and even escape.

13:57:13  10         It is troubling to the court that Mr. Mack began

11    his criminal drug and sex trafficking operation that's the

12    subject of the present case within the month following his

13    release from the Bureau of Prisons for his drug conspiracy

14    conviction for which a 100-month sentence was imposed and

13:57:42  15    while he was just beginning his three-year period of

16    supervised release.

17         Perhaps even more troubling is how Mr. Mack went

18    about committing the instant offenses.  He and his

19    codefendant, Ashley Onysko, recruited young, vulnerable

13:58:13  20    female victims, one of whom was a minor, to engage in

21    commercial sex acts through threats of force and coercion

22    and the coercion was unique in some respects.  In this

23    regard, it was the testimony -- there was testimony of

24    threats of physical harm and in one instance of a body

13:58:55  25    cavity search of his victims when he thought someone had

1    taken money from him.

2         Another aspect of the coercion was to front his

3    victims with the drugs that they were addicted to, heroin

4    for three of them, cocaine for one, and withhold those drugs

13:59:20  5    from them until he permitted them to have them, which

6    usually required them to perform the commercial sex acts

7    that he required of them.

8         The court heard the testimony of witnesses who

9    described the physical and psychological effects of coming

13:59:52  10   off a heroin high and the intense craving and need and

11   desire to take more of the drug so that the severe and

12   painful and physical and emotional effects of the withdrawal

13   could be alleviated, and defense counsel is correct when he

14   says that the victims came with their drug problems, with

14:00:19  15   their drug addictions, but that's what made them so

16   vulnerable and so useful to Mr. Mack, and he seized upon

17   that vulnerability in this case to require them to work for

18   him in his operation.  So it really wasn't a very fair

19   playing field when the victims were concerned.  They had an

14:01:00  20   addiction.  He recognized it, and he used it for his

21   purposes.

22         Based upon the testimony that the court heard,

23   it's clear that the drug and sex trafficking operation was

24   the brainchild of Mr. Mack, although Ms. Onysko was his

14:01:48  25   codefendant and worked with him to operate his business.

1   She took all of her direction from him.  He supervised every

2   aspect of the operation, starting with the victims who were

3   selected to the amount they would charge for their services

4   or that would be charged for the services of the victims in

14:02:21   5   the commercial sex trafficking portion of the business.  He

6   also determined when the victims would be given drugs, how

7   they would dress and look when they were on appointments,

8   how the money the victims earned by prostituting themselves

9   was divided between Mr. Mack and his codefendant, to how

14:02:49  10   much money was applied to the victim's drug debt.

11   He even instructed Ms. Onysko on how to keep

12   records regarding the monies that were in the operation.  He

13   instructed the victims as to how to keep track of their drug

14   debt and to notify him of their drug debt.  He really did

14:03:17  15   control the operation and the victims who participated in

16   the operation.

17   And if the court is recollecting some of these

18   text messages, some of them -- in some of them, the victims

19   express their fear of him, asking him not to be angry with

14:03:56  20   them for things they had done or hadn't done or weren't able

21   to do.  They also recall -- I also recall seeing text

22   messages where they were begging Mr. Mack to provide them

23   with the drug because they were experiencing withdrawal, and

24   he withheld it until he was ready to give it to them and

14:04:33  25   until he determined that they should have it.  So Mr. Mack

1    targeted on vulnerable victims, victims who had drug

2    problems and who he could manipulate psychologically.

3           As I said before, he was able to maintain his

4    control over his victims, both financial and psychological,

14:05:09  5    because of the way he fronted them with the drugs and

6    allowed them to really fall hopelessly into debt with him so

7    that to repay him, they were made to believe that they had

8    to perform the commercial sex acts.  So it was a vicious,

9    never-ending cycle.

14:05:39 10           And defense counsel points out that some of these

11   victims were only with Mr. Mack for five weeks, three weeks,

12   ten weeks, and I believe the other was three and a half

13   weeks or three and a half months, but that's because -- and

14   we don't know really -- this story does have an ending for

14:06:07 15   the victims, because arrests were made.  But had the arrests

16   not been made in this case, we don't know if it would have

17   gone beyond the three weeks, five weeks or ten weeks or if

18   the women would have survived beyond the five weeks or three

19   weeks or ten weeks, but it was a relatively short-lived

14:06:35 20   operation, if you will, because it was discovered thankfully

21   for the victims.

22           So another way he manipulated, Mr. Mack was able

23   to manipulate them is to tell them, this is particularly to

24   Number 4, he loved the victims, he would care for them, but

14:07:09 25   his form of care and concern for his victims was really all

Lori A. Callahan, RMR-CRR          (330) 252-6022

1     about preserving them in order to accomplish his own goals

2     and to earn money for his operation.  It was a very cruel

3     and callous sort of concern for his victims.

4             Mr. Mack also directed that the services be

14:07:46  5     advertised on the Internet.  Again, he controlled the money

6     that the victims were paid.  He took a portion off the top

7     as his cut.  He applied a portion of it to his codefendant's

8     debt that she owed to him, and then applied the balance to

9     the drug debt owed by the victims.

14:08:12 10             Mr. Mack has not demonstrated at least to this

11     court any remorse for the harm that he caused to his

12     victims.

13             And while his own personal circumstances when he

14     was growing up might perhaps explain some of what haunts

14:08:40 15     Mr. Mack, it really does very little to ameliorate the

16     crimes to the fact that he had on others, particularly his

17     victims, and if truly that is all he knows, then that is a

18     very compelling reason to impose a substantial sentence in

19     this case, because if that is all he knows and all he will

14:09:13 20     ever do, then society must be protected.

21             So the guideline sentence in this case is life.

22     And that's a sentence that should never be imposed lightly.

23     And it should only be imposed after taking into

24     consideration all of the factors that the court is required

14:09:40 25     to consider.

1          It cannot be disputed that the offenses that

2     Mr. Mack committed were of a very serious nature.  As I

3     said, he forced three adult women and one minor by preying

4     upon their vulnerabilities and specifically their drug

14:10:06  5     addictions and to committing these acts of prostitution.  He

6     used them to serve him even to the point of requiring them

7     to perform duties at the house in which they lived with him.

8          He continued to commit crimes while he was being

9     held on these offenses and that he continued from the

14:10:33 10     holding facilities, CCA, to contact people, and it's from

11     that that the obstruction crimes were charged, from his

12     desire to even control people in his situation while even in

13     prison.

14          So given this sort of background, it's evident

14:11:17 15     that not even being incarcerated prevents Mr. Mack from

16     committing additional crimes, and his background indicates

17     that he will continue to re-offend and the court finds that

18     the public needs to be protected from Mr. Mack as he has

19     shown very little regard for our laws, for society, and in

14:11:48 20     this case, for his victims.

21          He's received multiple custody sentences for his

22     previous convictions, and yet, has failed to reform to any

23     degree or to make any positive life-style changes.  His

24     conduct raises very significant concern for the safety of

14:12:11 25     the community.

1          We dwelled on the sex trafficking portion of his

2     crimes much today and didn't even talk about to any great

3     degree the drug trafficking, the fact that he was selling

4     drugs to others outside of the victims in this case.  And

14:12:45   5     that in many cases, that is the only offense, and it's a

6     serious offense standing alone.

7          So the court finds that in this particular

8     instance, given the defendant's background, given the nature

9     and circumstances of the offense, given all of the factors

14:13:06  10     that the court is required to consider, particularly the

11     safety of the community, that and the need to protect the

12     public from further crimes from Mr. Mack, that the guideline

13     sentence is an appropriate sentence and is warranted in this

14     case to meet the purposes of sentencing under the sentencing

14:13:34  15     statutes.

16          Also such a sentence is also to achieve other

17     sentencing factors including just punishment, adequate

18     deterrence and to afford Mr. Mack treatment opportunities

19     while he's in custody.  It seems like the only advances,

14:13:56  20     positive advances Mr. Mack has made were made when he was

21     incarcerated.  That's when he obtained his GED.  That's when

22     he obtained training.  When he has been permitted to operate

23     in society, he resorts to what has been described as what he

24     knows.  And that's what makes him dangerous.

14:14:34  25          So pursuant to the Sentencing Reform Act of 1984,

Lori A. Callahan, RMR-CRR     (330) 252-6022

1    and Title 18, United States Code, Section 3553(a), it is the

2    judgment of the court that the defendant, Jeremy Mack, is

3    hereby committed to the custody of the Bureau of Prisons to

4    be imprisoned for a term of life on each of Counts 2, 3, 4,

14:15:11  5    and 5, a term of 60 months on Count 1, and a term of 240

6    months on each of Counts 6, 7, 8 and 9, all to be served

7    concurrently.

8              With respect to the supervised release violations,

9    the court has considered the sentencing factors as set forth

14:15:38  10   in the sentencing statute, as well as the nonbinding policy

11   statements in Chapter 7 of the guidelines in conjunction

12   with the record in this case.

13             Within one month of being released to a three-year

14   period of supervised release from a 100-month sentence,

14:16:07  15   Mr. Mack engaged in this very serious criminal activity.  It

16   seems as though he had no regard for the fact that he was on

17   supervised release because he went full steam ahead in his

18   operation and this was beyond, I think, in the terms of

19   Chapter 7, a breach of trust.

14:16:44  20             When you're placed on supervised release, that's a

21   time when you're supposed to be integrating back into

22   society in a way you can become a productive member of

23   society.  Instead, it appears as though Mr. Mack could

24   hardly wait to start his next criminal presentation and he

14:17:05  25   did.  So the court will impose the guideline sentence in

1    that case of 24 months to run consecutive to his sentence in

2    this case.

3           The court will not impose supervised release

4    relative to the 2005 case, because the defendant will

14:17:37  5    have -- because of the nature of the sentence in the 2013

6    case.

7           I will pause for just a moment to ask Mr. Whitney

8    and Mr. Ray if there's a request for a particular

9    institution while I discuss the custody portion of the

14:18:02  10    sentence?

11           MR. WHITNEY:  No, Your Honor.

12           THE COURT:  All right.  Upon release from

13    imprisonment, Mr. Mack shall be placed on supervised release

14    for a term of ten years.  This term consists of three years

14:18:21  15    on each of Counts 1, 8 and 9, and a term of ten years on

16    each of Counts 2, 3, 4, 5 and 6 and 7, all such terms to run

17    concurrently.

18           Within 72 hours of release from the custody of the

19    Bureau of Prisons, Mr. Mack shall report in person to the

14:18:38  20    United States Probation Office in the sentencing district or

21    in the district in which he is released.

22           Mr. Mack shall pay a fine in full immediately in

23    the amount of $5,000 through the clerk of the United States

24    District Court.  This fine is due and payable immediately.

14:18:58  25           He shall pay 25 percent of his gross income per

1 month through the Federal Bureau of Prison's Financial

2 Responsibility Program.  If restitution balance remains upon

3 release from imprisonment, payment is to commence no later

4 than 60 days following release from imprisonment to a term

14:19:15 5 of supervised release or at least a minimum of 10 percent of

6 Mr. Mack's gross monthly income during the term of

7 supervised release and thereafter as prescribed by law.

8   Notwithstanding establishment of a payment

9 schedule, nothing shall prohibit the United States from

14:19:30 10 executing or levying upon property of Mr. Mack discovered

11 before or after the date of this judgment.

12   Mr. Mack shall pay to the United States a special

13 assessment of $900, which is due and payable immediately.

14   While on supervision, Mr. Mack shall not commit a

14:19:52 15 federal, state or local crime.

16   He shall not illegally possess a controlled

17 substance.

18   He shall comply with the standard conditions that

19 have been adopted by this court and shall comply with the

14:20:01 20 following additional conditions:

21   He shall refrain from any unlawful use of a

22 controlled substance, and submit to one drug test within 15

23 days of the commencement of supervision and to at least two

24 periodic drug tests thereafter as determined by his

14:20:14 25 probation officer.

1        He shall not possess a firearm, destructive device

2   or any dangerous weapon.

3        He shall participate in an approved program of

4   substance abuse testing and/or outpatient or inpatient

14:20:25   5   substance abuse treatment as directed by his supervising

6   officer and abide by the rules of the treatment program.  He

7   shall not obstruct or attempt to obstruct or tamper in any

8   fashion with the prohibitive substance testing.  He shall

9   undergo a mental health evaluation and/or participate in a

14:20:42  10   mental health treatment program as directed by his

11   supervising officer.

12        He shall participate in the cognitive behavioral

13   treatment program as instructed by his probation officer.

14        He shall cooperate in the collection of DNA as

14:21:00  15   directed by his probation officer.

16        He shall submit his person, residence, place of

17   business, computer or vehicle to a warrantless search

18   conducted and controlled by the probation office at a

19   reasonable time and in a reasonable manner based upon

14:21:14  20   reasonable suspicion of contraband or evidence of a

21   violation of a condition of release.  Failure to submit to a

22   search may be grounds for revocation.  Mr. Mack shall inform

23   any other residents that the premises may be subject to a

24   search pursuant to this condition.

14:21:28  25        Mr. Mack is required, pursuant to Title 18, United

Lori A. Callahan, RMR-CRR      (330) 252-6022

1    States Code, Section 3583 to register under the Sex Offender

2    Registration and Notification Act and must comply with the

3    requirements of the act as directed by his probation

4    officer.

14:21:46  5        Pursuant to the Adam Walsh Child Protection Act of

6    2006, Mr. Mack will keep his registration current in each

7    jurisdiction in which he resides, is employed or is a

8    student.

9        Mr. Mack shall no later than three business days

14:22:00  10   after each change in name, residence, employment or student

11   status appear in person in at least one jurisdiction in

12   which he is registered and inform that jurisdiction of all

13   changes and reporting information.  Failure to do so may be

14   a violation of his conditions of supervised release and may

14:22:17  15   be a new federal offense punishable by up to ten years.

16       Mr. Mack will abide by all rules of the Minor

17   Protection Restriction Program of the United States Pretrial

18   Services and Probation Office.

19       He shall submit to a mental health evaluation and

14:22:38  20   sex offender assessment as directed by his probation

21   officer.  He shall participate in any treatment program,

22   including programs for sexual deviancy, which may include

23   polygraph testing if recommended by the -- these

24   evaluations.

14:22:54  25       He shall submit to periodic polygraph testing as

Lori A. Callahan, RMR-CRR        (330) 252-6022

1    directed by his probation officer.  No violation proceedings

2    will be based solely on the results of a polygraph

3    examination or a valid Fifth Amendment refusal to answer a

4    polygraph question.

14:23:09  5           He is prohibited from accessing any on-line

6    computer service at any location, including employment or

7    education, without written approval of his probation officer

8    or the court.  This includes any Internet service provider,

9    bulletin board system or any other public or private

14:23:32 10   computer network.  Any approval must be -- or shall be

11   subject to conditions set by his probation officer or the

12   court with respect to any such approval.

13           Mr. Mack shall consent to the probation office

14   conducting periodic, unannounced examinations of his

14:23:49 15   computer systems, which may include retrieval and copying of

16   all memory from hardware, software and/or removal of such

17   systems for the purpose of conducting a more thorough

18   inspection and will consent to having installed on his

19   computer at his expense any hardware, software to monitor

14:24:07 20   his computer or use or prevent access to particular

21   materials.  He shall consent to periodic inspection of any

22   such installed hardware and software to insure that it is

23   functioning properly.

24           Mr. Mack shall provide his probation officer with

14:24:27 25   accurate information about his entire computer system,

1    hardware and software, all passwords used by him and his

2    Internet service providers and shall abide by all rules of

3    the computer restriction and monitoring program.

4         He shall submit his person, residence, place of

14:24:46  5    business, computer and/or vehicle, I believe I said this

6    before, but I'm going to repeat it, to a warrantless search

7    conducted and controlled by his probation officer at a

8    reasonable time and in a reasonable manner based upon

9    reasonable suspicion of contraband or evidence of a

14:25:00 10    violation of a condition of release.  Failure to submit to

11    the search may be grounds for revocation.  He shall inform

12    any other residents that the premises and his computer may

13    be subject to a search pursuant to this condition.

14         So with that, Counsel, do you have any objections

14:25:31 15    or know of any reason why the sentence as stated by the

16    court should not be imposed?

17         MS. BRENNAN:  Nothing on behalf of the government,

18    Your Honor.  No objection.

19         THE COURT:  Thank you.

14:26:08 20         MR. WHITNEY:  Your Honor, other than what we put

21    on the record so far, we have no further objection.

22         THE COURT:  Very well.  Thank you, Mr. Whitney and

23    Mr. Ray.

24         Mr. Mack, the court hereby advises you that you

14:26:21 25    have the right to appeal your conviction and sentence in

1    this case.  If you do not have enough funds to allow you to

2    take an appeal, you have the right to have someone appointed

3    to represent you in prosecuting an appeal, and you would

4    have the right to appeal without cost to you.  Also you have

14:26:34  5    the right to apply for leave to appeal in forma pauperis.

6    In that event, the clerk of court will prepare and file a

7    notice of appeal upon your request.

8              Be advised that with a few exceptions, any notice

9    of appeal must be filed within 14 days of the entry of this

14:26:47  10    court's judgment.

11             Do you understand all that I've said relative to

12    your right to appeal, sir?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  All right.  And, Counsel, relative to

14:27:02  15    your representation of --

16             MR. WHITNEY:  Your Honor, we believe --

17             THE COURT:  -- Mr. Mack, on any --

18             MR. WHITNEY:  We believe -- thank you.  We believe

19    that the defendant ought to have other counsel look at

14:27:15  20    obviously what occurred during the trial, but we will, if

21    the court wishes us, to see to it that the notice of appeal

22    is filed.

23             THE COURT:  All right.  Since you're basically

24    asking for new counsel to be appointed for Mr. Mack for

14:27:26  25    purposes of any appeal that you may wish to file, the court

|     |     |
| --- | --- |
| | 1 | will within the next day select someone so that they can in |
| | 2 | turn file a notice. |
| | 3 | Is that your desire, Mr. Mack? |
| | 4 | THE DEFENDANT:  Yes, Your Honor. |
| 14:27:40 | 5 | THE COURT:  All right.  Then I will proceed |
| | 6 | accordingly. |
| | 7 | MR. WHITNEY:  So we will not be responsible for |
| | 8 | filing a notice of appeal? |
| | 9 | THE COURT:  No.  You will be notified tomorrow, |
| 14:27:51 | 10 | possibly today, the name of that counsel so counsel can then |
| | 11 | interact with Mr. Mack and you. |
| | 12 | All right.  With that, is there anything further |
| | 13 | to address with the court? |
| | 14 | MS. BRENNAN:  No, Your Honor.  Thank you. |
| 14:28:04 | 15 | MR. WHITNEY:  No, Your Honor.  Thank you. |
| | 16 | THE COURT:  That completes this proceeding.  And |
| | 17 | Mr. Mack is remanded to the custody of the marshals so that |
| | 18 | he may be transferred to an appropriate institution so that |
| | 19 | he may serve his sentence in this case. |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Lori A. Callahan, RMR-CRR      (330) 252-6022

1                    C E R T I F I C A T E

2

3         I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled

5    matter.

6

7

8                   s/Lori A. Callahan
                    Lori Ann Callahan, RMR-CRR
9                   U.S. District Court, Suite 568
                    2 South Main Street
10                  Akron, Ohio  44308
                    (330) 252-6022
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25